**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

No. 24-1116

---

RICHARD HIGHTOWER,

Plaintiff-Appellant,

v.

CITY OF PHILADELPHIA, SERGEANT SHANTEL MAJOR, and CORRECTIONAL OFFICER JOHN DOES 1–10,

Defendants-Appellees.

---

**BRIEF OF APPELLANT RICHARD HIGHTOWER**

---

On appeal from an Order of the United States District Court for the Eastern District of Pennsylvania, entered on December 22, 2023, in Docket No. 2:21-cv-04075-KSM

---

Thomas R. Kline
Charles Becker
Ruxandra M. Laidacker
Colin Burke
Michelle A. Paznokas
**Kline & Specter, PC**
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
*Attorneys for Appellant Richard Hightower*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................iii

I. STATEMENT OF JURISDICTION....................1

II. STATEMENT OF THE ISSUE....................2

III. STATEMENT OF THE CASE....................2

A. Richard Hightower suffered catastrophic injuries when the City of Philadelphia placed him in an intake cell with a violent detainee, according to policy and custom....................2

B. After Mr. Hightower filed suit, the district court granted summary judgment in Defendants' favor....................5

IV. SUMMARY OF ARGUMENT....................6

V. ARGUMENT....................7

A. The standard of review....................7

B. Legal framework....................8

1. A pretrial detainee has a constitutionally protected right to be free from physical attack and injury by fellow prisoners....................8

2. Principles of municipal liability under Section 1983....................9

3. *Monell* as a pathway for proving a Fourteenth Amendment violation, given the record establishing the City's deliberate indifference to the danger of unjustified physical injury....................14

C. Mr. Hightower's claim against the City deserves a jury trial . 21

D. The district court erred by dismissing Mr. Hightower's claim against the City ... 30

VI. CONCLUSION ... 33

COMBINED CERTIFICATIONS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 8

*Board of Comm'rs of Bryan Cty. v. Brown,*
520 U.S. 397 (1997) .......... 13

*Brady v. Maryland,*
373 U.S. 83 (1963) .......... 13

*Colburn v. Upper Darby Township*,
838 F.2d 663 (3d Cir.1988) .......... 17, 19, 20

*Colburn v. Upper Darby Township,*
946 F.2d 1017 (3d Cir. 1991) .......... 17, 19, 20

*Connick v. Thompson,*
563 U.S. 51 (2011) .......... 12, 13

*City of Canton v. Harris,*
489 U.S. 378 (1989) .......... 11, 12
*Davidson v. O'Lone,*
752 F.2d 817 (3d Cir. 1984) .......... 9, 28

*Forrest v. Parry,*
930 F.3d 93 (3d Cir. 2019) .......... 14, 29

*Fuentes v. Wagner,*
206 F.3d 335 (3d Cir. 2000) .......... 16

*Hall v. Millersville Univ.*,
22 F.4th 397 (3d Cir. 2022). .......... 8

*Kaucher v. County of Bucks*,
455 F.3d 418 (3d Cir. 2006) ........................................................................8

*Monell v. Dep't of Soc. Serv. of City of N.Y.*,
436 U.S. 658 (1978) ..........................................................................6, 7, 10

*Natale v. Camden Cnty. Corr. Facility*,
318 F.3d 575 (3d Cir. 2003) ......................................................................14

*Palakovic v. Wetzel*,
854 F.3d 209 (3d Cir. 2017) ..............................................................15, 17, 21

*Riley v. Jeffes*,
777 F.2d 143 (3d Cir. 1985) ...................................................................15, 16

*Youngberg v. Romeo*,
457 U.S. 307 (1982) ...................................................................................10

**STATUTES**

28 U.S.C. § 1291...........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

42 U.S.C. § 1983...........................................................................................9

## I. STATEMENT OF JURISDICTION

Plaintiff Richard Hightower filed this civil rights action against the City of Philadelphia and its employee Sgt. Shantel Major. He asserted claims under 42 U.S.C. § 1983 against Sgt. Major and the City. Because the case raised a question of federal law, the district court exercised original jurisdiction under 28 U.S.C. § 1331. In July 2023, the defendants moved for summary judgment. J.A. 046-047. On December 23, 2023, the district court entered an order granting summary judgment and dismissing Mr. Hightower's claims against all defendants. *Id*. As Plaintiff timely filed his notice of appeal on January 18, 2024, this Court has jurisdiction under 28 U.S.C. § 1291. *Id*.

## II. STATEMENT OF THE ISSUE PRESENTED

This case presents one issue for the Court's consideration: Did the district court improperly grant summary judgment in the City's favor on the basis that, when viewing the evidence in the light most favorable to the Plaintiff, the City's pre-trial detainee housing customs and policies showed deliberate indifference amounting to a violation of Plaintiff's Due Process rights?

*Suggested answer: Yes.*

## III. STATEMENT OF THE CASE

### A. Richard Hightower suffered catastrophic injuries when the City of Philadelphia placed him in an intake cell with a violent detainee, according to policy and custom.

Richard Hightower filed this lawsuit under 28 U.S.C. § 1983 to recover damages against the City of Philadelphia for violating his constitutional rights. His claims stem from the City's policy of comingling non-violent pre-trial detainees with known violent offenders at the Curran-Fromhold Correctional Facility in Philadelphia. By way of summary, the City placed a violent offender named Mr. Anthony Tyler in the same intake cell with Mr. Hightower. That Mr. Tyler should never have been placed in same cell as

Mr. Hightower was demonstrated by the fact that Mr. Tyler violently assaulted Mr. Hightower caused Mr. Hightower to suffer a debilitating spinal cord injury and permanent paralysis. These are the background facts of Mr. Hightower's case.

On September 13, 2019, Richard Hightower was arrested and held as pre-trial detainee at Curran-Fromhold Correctional Facility. He was held on charges of burglary, theft by unlawful taking or disposition, criminal trespass, and receiving stolen property. Mr. Hightower was housed in bed 3 on unit B1, pod 4, cell 21. Mr. Hightower was classified as low risk for violence or "minimum security."

Around 5:40 a.m. on September 14, 2019, Anthony Tyler was assigned to bed 1 in the same cell. J.A. 59, 336. As soon as he arrived in the cell, Mr. Tyler threatened Mr. Hightower. *Id*. Mr. Tyler had been at the Curran-Fromhold Correctional Facility as a pre-trial detainee since August 19, 2019. Mr. Tyler had been held over on charges of aggravated assault and related charges. J.A. 63. The City had transferred him to the Curran-Fromhold Correctional Facility from the City Detention Center's infirmary where he had been receiving medical care for stab wounds he had received during the violent encounter that led to his detention. J.A. 58. Mr. Tyler arrived at the

Curran-Fromhold Correctional Facility with a history of prior arrests and convictions based on a history of violent and threatening criminal behavior outside the prison and inside the prison as well. In 2017 and 2018, Mr. Tyler had been charged on six different occasions and found guilty of escalating violent episodes while incarcerated, most of which included assaults toward other inmates and guards. J.A. 62-63.

On August 21, 2019, Mr. Tyler was classified as “close security” and listed as having “serious mental illness.” J.A. 337. This custody status indicates the highest level of risk of violence within the general population of pre-trial detainees and inmates. J.A. 59, 337. This status reflects the City’s knowledge of Tyler’s history of violent crime arrests and institutional misconduct.

The day after his placement in Mr. Hightower’s cell, on September 15, 2019, Mr. Tyler began banging on the door of the cell and yelling out at the guards. He then turned his focus on Mr. Hightower. He told Sgt. Major, the guard assigned to his block, that the cell was dirty and that Mr. Hightower was dirty as well. Mr. Tyler asked to switch to another cell and threatened to kill Mr. Hightower. Mr. Tyler then followed through on his threats. He pulled Mr. Hightower from his top bunk, forcefully driving him into the

cement floor and punching and kicking Mr. Hightower in the face and upper body. Mr. Hightower suffered catastrophic neurological injuries and became paralyzed. J.A. 60. Mr. Tyler was charged and convicted of assaulting Mr. Hightower. J.A. 60-61.

### B. After Mr. Hightower filed suit, the district court granted summary judgment in Defendants' favor.

On September 13, 2021, Mr. Hightower commenced this Section 1983 suit against the City of Philadelphia and Sgt. Major. As against Sgt. Major, Mr. Hightower alleged a violation of his Due Process rights under the rubric of the state-created danger doctrine. As against the City, Mr. Hightower asserted a claim for violation of his Due Process rights under the principles enunciated in *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658 (1978). J.A. 68-70. Mr. Hightower asserted that the City had a policy or custom at intake of comingling pre-trial detainees with the highest level of risk of violence requiring "close security" with pre-trial detainees classified as low risk for violence or "minimum security." *Id*. Mr. Hightower alleged that the policy violated Mr. Hightower's Due Process rights, causing his injuries. *Id*.

On December 22, 2023, the district court granted summary judgment in favor of both Defendants. As to the City, the district court reasoned that

the City's policy or custom of housing violent and non-violent pre-trial detainees together was not facially unconstitutional and did not create an obvious risk of harm. This appeal ensued, in which Mr. Hightower seeks reversal only of his claim against the City.

## IV. SUMMARY OF ARGUMENT

The district court should not have granted summary judgment on grounds that there was insufficient evidence upon which a jury could find that the City's policy of comingling non-violent detainees with violent detainees for housing purposes in the "intake" area of the Curran-Fromhold Correctional Facility violated the right of a pre-trial detainee to be free from physical attack and injury by fellow detainees under the Due Process Clause of the Fourteenth Amendment. A jury could conclude that the City knew or should have known that this policy posed a substantial risk of injury to non-violent detainees like Mr. Hightower, such that the City's policy amounted to deliberate indifference for purposes of stating a municipal liability claim under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). For these reasons and the reasons set forth below, summary judgment was improperly granted.

# V. ARGUMENT

## A. The standard of review

The Court exercises plenary review over a district court's grant of summary judgment, applying the same standard as the district court. *See Hall v. Millersville Univ.*, 22 F.4th 397, 402 (3d Cir. 2022). A district court may enter summary judgment when there is no dispute as to any genuine issue of material fact, such that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In conducting its review, this Court must accept all facts of record and reasonable inferences from those facts in a light most favorable to the non-moving party. *Hall*, 22 F.4th at 402. The Court should reverse if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

## B. Legal framework

### 1. A pretrial detainee has a constitutionally protected right to be free from physical attack and injury by fellow prisoners.

Under Section 1983, a government employee acting under color of law who subjects a plaintiff to the deprivation of any right secured by the Constitution may be liable to that plaintiff for injuries caused by those acts. 42 U.S.C. § 1983. Here, Mr. Hightower was a pre-trial detainee at the Curran-Fromhold Correctional Facility whose liberty rights are protected by the Due Process Clause of the Fourteenth Amendment. The complaint asserted a claim for violation of Mr. Hightower's Due Process liberty right to be free from physical attack and injury.

Mr. Hightower's constitutional claim is premised upon a well-established constitutional right. In *Davidson v. O'Lone*, 752 F.2d 817 (3d Cir. 1984), *aff'd sub nom. Davidson v. Cannon*, 474 U.S. 344 (1986), this Court explained that a pre-trial detainee has a constitutionally-protected "liberty" right of a pre-trial detainee "to be free from physical attack and injury" by fellow prisoners under the Due Process Clause. *See id.* at 822. The Court explained that a pre-trial detainee's "right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause,"

which is "not extinguished by lawful confinement" and protects the detainee from attacks committed not only by state custodians but also by other incarcerated persons. *Id.*, citing *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (prisoners similarly have an Eighth Amendment right to protection "from violence at the hands of other prisoners"). The City of Philadelphia has not challenged the viability of Mr. Hightower's claim on the basis that he failed to plead a constitutionally-protected right.

**2. Principles of municipal liability under Section 1983**

In *Monell*, 436 U.S. at 658-59, the U.S. Supreme Court held that municipal entities can be sued under Section 1983 independent of the potential liability of individual government employees. In *Monell*, female employees of the City of New York filed claims alleging their constitutional rights were violated when the City of New York as a matter of official policy compelled them to take unpaid maternity leave before such leaves were medically required. *Id.* at 661. On cross-motions for summary judgment, the district court held that the municipality was immune from suit. *Id*. at 662. The Second Circuit affirmed. *Id.* On further appeal, the U.S. Supreme Court reversed. *Id*. at 702. The Court reasoned that Congress had intended

"municipalities and other local government units to be included among those ***persons*** to whom § 1983 applies" such that local governing bodies therefore could be "sued directly under § 1983 for monetary, declaratory, or injunctive relief." *Id*. at 690-91. The basis for potential liability is the municipality's own conduct and not vicarious liability. *Id*. at 694. Liability may be premised upon any allegation of an unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690-91. Local government "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id*. The official policy or custom must be "the moving force of the constitutional violation" alleged by the plaintiff. *Id*. at 695.

Building on *Monell*, the Supreme Court developed the concept of municipal liability under Section 1983 in *City of Canton v. Harris*, 489 U.S. 378 (1989). There, the plaintiff was arrested and brought to the police station. During transport and at the police station, the plaintiff visibly displayed signs of medical distress but the police officers summoned no medical assistance for her. Following release from police custody, the plaintiff was

diagnosed with medical conditions requiring hospitalization. *Id*. at 381-82. The plaintiff subsequently filed suit under Section 1983 for the City's violation of her right under the Due Process Clause to receive necessary medical attention while in police custody. *Id*. Following trial, the jury returned a verdict in favor of the plaintiff and the City of Canton appealed. The Sixth Circuit reversed. In turn, the U.S. Supreme Court granted certiorari, vacated the judgment of the Court of Appeals and remanded the case for further proceedings.

The Court explained that a policy or custom for which a municipality is responsible may serve as the basis for Section 1983 liability where the policy or custom "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Id*. at 388. The Court explained that the focus of plaintiff's liability evidence "must be on adequacy of the [policy or custom] in relation to the tasks the particular officers must perform." *Id*. at 390-91. In turn, the plaintiff must establish that the policy or custom actually caused the employee's indifference to the plaintiff's rights. *Id*.

The Court expanded on a plaintiff's requisite proofs in *Connick v. Thompson*, 563 U.S. 51, 70 (2011). In *Connick*, the plaintiff was convicted and

spent nearly two decades in prison before his investigator discovered evidence that undermined his convictions. The Orleans Parish District Attorney's Office conceded that its failure to turn over exculpatory evidence to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The convictions were vacated. Following his release, Mr. Thompson filed a Section 1983 claim against the Orleans Parish District Attorney. He alleged that the District Attorney had failed to train his prosecutors adequately about their duty to produce exculpatory evidence and that the lack of training had caused the nondisclosure in plaintiff's case. A jury returned a verdict in favor of the plaintiff. The Fifth Circuit affirmed by an evenly-divided *en banc* court. *Connick*, 563 U.S. at 55-59.

The Supreme Court reversed, explaining that a plaintiff seeking to state a Monell claim was obliged to plead a "pattern of violations" demonstrating "deliberate indifference." *Id*. at 70. Evidence of a single violation of federal rights is available only "in a narrow range of circumstances," and is "enough only where accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id*; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997).

*Monell*, *City of Canton*, and *Connick* provide a roadmap for pursuing claims under Section 1983 relating to the presence or inadequacy of municipal policies. A plaintiff may point to an unconstitutional policy or custom leading to his injuries. In that circumstance, potential municipal liability may arise when an appropriate entity or officer "promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). When relying on a specific policy, a plaintiff may point to an "official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject." *Forrest*, 930 F.3d at 105-06. When relying on a custom, a plaintiff instead may point to a "course of conduct so well-settled and permanent as to virtually constitute law." *Forrest*, 930 F.3d at 105-06.

A plaintiff also may establish a cognizable claim by pointing to a municipality's failure to create a policy or custom. In that circumstance, the plaintiff must establish a failure or inadequacy rising to the level of deliberate indifference. *Forrest*, 930 F.3d at 105–06.

Either way, the plaintiff must prove deliberate indifference to a substantial risk of harm through evidence that (1) municipal policymakers

know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. *Id.* at 106.

### 3. *Monell* as a pathway for proving a Fourteenth Amendment violation, given the record establishing the City's deliberate indifference to the danger of unjustified physical injury.

Against the backdrop of *Monell*, *City of Canton*, *Connick*, and *Forrest*, Mr. Hightower alleged claims constituting a violation of the constitutionally-protected "liberty" right of a pre-trial detainee "to be free from physical attack and injury" by fellow prisoners. The Court has not addressed a pre-trial detainee's right to be protected from such harm in the combined context of municipal liability and the Due Process Clause of the Fourteenth Amendment. However, it has addressed this general issue in the context of Eighth Amendment protections. *See Riley v. Jeffes*, 777 F.2d 143 (3d Cir. 1985).

In *Riley*, the Court explained generally that although the Eighth Amendment does not apply directly to pre-trial detainees, the fundamental protections afforded to pre-trial detainees under the Due Process Clause are at least as robust "for personal security" as those guaranteed by the Eighth Amendment. *See Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017), citing

*Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000). The Court also addressed the factual circumstance of an inmate's right to be protected from harm from other prisoners. In *Riley*, the plaintiff asserted in relevant part that numerous fights and assaults among prisoners at a Pennsylvania prison resulted from the prison officials' "practice of giving security lock keys to inmates and allowing dangerous inmates to have control and possession of keys and to keep cell block doors open."[1] He claimed that this practice caused him "mental and emotional distress because of his fear of being assaulted while he is asleep in his cell." *Riley*, 777 F.2d at 144-45. The district court granted the defendants' Rule 12(b)(6) motion and dismissed the claim and the plaintiff appealed.

On appeal, this Court vacated the judgment insofar as it dismissed the Eighth Amendment claim. Construing the Eighth Amendment, the Court acknowledged that "[m]any prisoners are unpredictable. Prison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous." *Id.*

---

[1] *Riley* is a case where the allegations of constitutional violation were made against the defendants in their official capacity such that the case is instructive on municipal liability as well. *See Monell*, 436 U.S. 690 n.55 ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," at least for purposes of *Monell*.).

at 145. But the complaint alleged more: a custom permitting "ready access to cells when the occupants are asleep and are unprotected by prison guards" that creates an environment in which the plaintiff was "compelled to live in constant anxiety, fear, and tension." *Id*. Given the record in the case, the Court held that the plaintiff had stated a *prima facie* case for relief against prison officials, where he alleged sufficient facts to show "a pervasive risk of harm to inmates from other prisoners," and that the prison officials displayed "deliberate indifference" to the danger of "unwarranted physical injury." *Id*. at 147. While a "pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents," the plaintiff is not obliged to prove that there was "a reign of violence and terror" in the prison either. *Id*.

A similar approach may be found in other decisions of this Court resulting in potential municipal liability under the Due Process Clause in the context of prison suicide. See *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir.1988) ("*Colburn I*"); *Colburn v. Upper Darby Twp*., 946 F.2d 1017 (3d Cir. 1991) ("*Colburn II*"); *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017).

In the *Colburn* line of cases, the plaintiff fatally shot herself while in the custody of police following arrest for public intoxication. The plaintiff

arrived at the police station around 5:30 p.m. A first officer patted her down and found only keys. A second officer who saw the plaintiff holding pills identified as Valium, patted her down again, this time recovering a bullet. A third officer responsible for body searches of female detainees then conducted a third search, more thorough search. The plaintiff was not strip searched on the basis that she was detained for public drunkenness and her body-hugging clothing made it difficult to conceal weapons. The plaintiff then was moved to a jail cell designated for women, where she was visited three times by an officer. At all times, she appeared calm ad cooperative, giving the officer no indication she was contemplating suicide. Around 6:15 p.m., another officer started her shift who continued to monitor the plaintiff. At 7 p.m., the plaintiff became agitated and told the officer that she was going through a break-up and eviction, and that she had a daughter who was with her mother at the time. At 8 p.m., the plaintiff calmed down and called her mother and they had a fight. Around 8:30, the officer checked and saw the plaintiff calm. The officer told the plaintiff that she would be released around 10 p.m. Just before 9 p.m., the officer heard a "small pop" and say the plaintiff collapsed, having committed suicide with a small handgun. The record in the case also revealed that Upper Darby Township

had provided procedures for suicide prevention that included patting down detainees and consistent monitoring. It did not include any formal physical or mental health screening of detainees. The officers testified that attempted suicides in pre-trial detention were common, including about twenty attempts in the previous ten years, two of which had been successful. *See Colburn II*, 946 F.2d at 1020-23.

Against this factual background, the municipality initially filed a Rule 12(b)(6) motion that the district court granted and that this Court reversed. *See Colburn I*, 838 F.2d at 669. In *Colburn I*, the Court explained that "if [custodial] officials know or should know of the particular vulnerability to suicide of a pre-trial detainee, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." *Id*. To establish liability, a plaintiff must show that: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability. *Id*. The Court added that for purposes of establishing "deliberate indifference," the plaintiff had to show "a level of culpability higher than a negligent failure to protect from self-inflicted harm." *Id*.

Upon remand, the district court granted summary judgment. On further appeal in *Coburn II*, the Court explained that even where a "strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood." This does not mean that the detainee's custodian must have "a subjective appreciation of the detainee's particular vulnerability." There simply can be no "deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Colburn II*, 946 F.2d at 1024-25. The Court concluded that the record did not create a triable issue of fact against this legal standard. *Id*. at 1022-23.

The Court applied the *Colburn* line of cases in *Palakovic*, *supra*. There, a mentally ill young man committed suicide while imprisoned at another state prison. When he arrived at the prison, he underwent a mental health screening that identified him as a high risk of suicide in addition to other serious mental disorders, and was placed on the prison mental health roster. During his incarceration, the plaintiff garnered the nickname "Suicide." Yet the prison failed to perform a comprehensive suicide risk assessment or provide any clinical care responsive to his conditions. The prison had insufficient staff and overmedicated prisoners rather than offering effective

treatment options. The plaintiff also was subjected to solitary confinement, general isolation, and limited time outside his cell. The complaint alleged that prison officials knew that exposure to these conditions carried risk of suicide and had documented "dozens of incidents" in which prisoners on the mental health roster engaging in self-harm. *Palakovic v. Wetzel*, 854 F.3d at 216-17.

The defendants moved for dismissal under Rule 12(b)(6), which the district court granted on grounds that the complaint failed to plead facts sufficient to satisfy the *Colburn* framework. This Court reversed, reasoning that "vulnerability to suicide" was not the only framework for proving an Eighth Amendment claim in the context of prison suicide. *Id*. at 225. Another means was showing "inhumane prison conditions premised on evidence the prison official "deprived the prisoner of the minimal civilized measure of life's necessities" and "acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health." *Id*. Another means was assessing whether the plaintiff's record of staffing and medication against a recognized need for medical care met the threshold of deliberate indifference to the plaintiff's serious medical needs. *Id*. The Court emphasized that the law did not require the prison to have a

"subjective appreciation of the detainee's particular vulnerability." The Court added that a constitutional violation could occur in various circumstances, including: (1) defendant's affirmative act leading to suicide; (2) defendant's ignoring responsibility to prevent known suicidal tendency; (3) defendant protecting the prisoner from self-inflicted wounds, or (4) defendant disregarding knowledge and repeatedly placing the prisoner in circumstances that the defendant knew the risk was even greater. *Id*. at 231.

While *Colburn* and *Palakovic* involve different circumstances, they suggest that municipal policies and customs may violate a pre-trial detainee's Due Process right to liberty when they subject the detainee to unjustified risk of physical injury from themselves or another person. Under this body of law, the threshold for proving deliberate indifference need not arise to the level of subjective appreciation by municipal employees of the detainee's particular vulnerability. It is enough that municipal employees knew or should have known that conditions of detention exposed the detainee to a substantial risk of serious damage to his future health.

**C. Mr. Hightower's claim against the City deserves a jury trial.**

Here, the record contains enough evidence to permit advancement of Mr. Hightower's Section 1983 claim against the City of Philadelphia. As a

starting point, the Philadelphia Prisons Policy & Procedures acknowledge the importance of segregating inmates posing different risks of violence to other inmates. Thus, for persons who are convicted, the Philadelphia Prisons Policy & Procedures include a section on the "Inmate Classification Process." J.A. 219. Within this compilation of policies is Policy Number 4.B.1, which establishes a classification system for inmates based on concern for their personal safety. It also provides for segregation of inmates by risk of violence, with inmates having similar security profiles being housed together to allow for appropriate management of the risk of violence:

> It is the policy of the [Philadelphia Prison System] to classify inmates according to a system that contributes to public safety and provides for the personal safety of inmates and staff. Inmates with similar profiles will be housed together in environments appropriate to their security requirements. Inmates will not be classified or housed by race, color, creed, or national origin, but will be separated by gender, behavior, and/or management reasons.

*Id.* (emphasis added).

The classification process uses a point system to determine the potential risks of the inmate. J.A. 219–24. A correctional officer calculates each inmate's score based on the inmate's current charges, prior criminal history, prior institutional behavior, age, length of sentence, medical and

psychological histories, recidivism score, and other salient factors. *Id.* The score falls within four custody statuses (from least dangerous to most dangerous): Community, Minimum, Medium, and Close. J.A. 222. The inmates are housed according to their custody status. J.A. 219–24. The inmate classification system is designed for the safety of inmates and prison personnel. J.A. 219.

During litigation, employees of the Philadelphia Prison System made clear that this policy of classification is central to the City's obligations to protect the safety of inmates. *See Farmer*, 511 U.S. at 833 (prisoners have an Eighth Amendment right to protection "from violence at the hands of other prisoners"). The record contained evidence that:

- Deputy Chief Beaufort testified that safety of the inmates is one of the considerations for why close custody and minimum custody are separated. J.A. 542.

- Deputy Warden Bowers testified, "You should never have a community or a minimum with a close, but we wouldn't know that during the intake/quarantine housing until they are classified." J.A. 408.

- Deputy Warden Bowers testified that "having someone that's charged with homicide in with someone, you know, with a low level charge, it's not good practice." J.A. 429–30.

- Director Thomas agreed that generally speaking, the classification instruments that are used by the Philadelphia Prison System are designed, at least in part, to ensure the safety of the inmates within the prison. J.A. 701–02.

- Director Thomas testified that the classification system is in place to ensure that the prison meets its duty to protect inmates. J.A. 703.

Pre-trial detainees also are classified in accordance with the same system for inmates. J.A. 358-62 (Tyler evaluation); J.A. 510-11 (Hightower evaluation). Mr. Tyler was assessed as a "close security" risk on August 21, 2019, shortly after arriving at the Curran-Fromhold Correctional Facility, reflecting his violent history including violence within an institutional setting. Mr. Tyler had been assessed a "close" security risk as far back as October 2017. *Id*. Mr. Hightower was classified non-violent "minimum security" risk, the opposite end of the risk spectrum, shortly after he arrived at the Curran-Fromhold Correctional Facility on September 15, 2019. *Id*.

Having made these assessments, the City had a policy or custom in place by which pre-trial detainees assessed as posing different levels of threat of violence to other detainees and requiring different security protocols were nevertheless comingled in the "intake" area of the Curran-Fromhold Correctional Facility. Under this policy or custom, the City would

commingle close security and minimum security detainees in this intake area for days. The City had this policy or custom relating to pretrial detainees notwithstanding its policy providing for segregation of inmates by security profile in the general population areas of the prison. Testimony from Philadelphia Prison Service officials describe the commingling policy applicable to pretrial detainees housed in the intake area and illustrated the dangers that the policy posed:

- Deputy Warden Bowers testified that in the intake/quarantine unit, inmates who may have already been designated close custody would not be separated from the individuals who may be unclassified or minimum custody. J.A. 409.

- Deputy Warden Bowers testified that an inmate who has a violent history may be housed with someone who is non-violent in intake. J.A. 410.

- Deputy Warden Bowers agreed that in terms of where inmates are housed on the intake/quarantine unit, other than availability of a cell, there is no other influence in terms of where the inmates will go. J.A. 416–17.

- Deputy Chief Beaufort testified that for initial intake he did not know of any or procedure that separates inmates based on their propensity for violence or their criminal charges or their institutional behavior. J.A. 533.

- Deputy Chief Beaufort testified that in intake, you might have a young guy with a bad history of institutional

violence and a very serious violent charge housed with an older guy with no violent history on a non-violent charge. J.A. 533–34.

- Deputy Chief Beaufort testified that "every time you come in … it's a new start" and he agreed that "[f]irst available bed is where you go." J.A. 559.

- Deputy Chief Beaufort agreed that "it's just a complete crap shoot in terms of who you were housed with in terms of custody status." J.A. 570–71.

The record showed that officials of the Philadelphia Prison Service also were aware that the policy of comingling pre-trial detainees requiring different security management posed substantial risk of serious injury to minimum security, nonviolent detainees such as Mr. Hightower:

- Deputy Warden Bowers testified that in her experience as a deputy warden specific to the intake/quarantine unit, "there have been and there were many times" where individuals who had a history of violence would assault non-violent inmates in the intake/quarantine unit. J.A. 413.

- Director Thomas testified that close custody status means that an inmate is more likely to act out in a violent way compared to other inmates. J.A. 639.

Plaintiff also produced the report of Mr. Donald Leach, a correctional administration expert. Mr. Leach described that the Curran-Fromhold Correctional Facility "had an unacceptable practice or custom to co-mingle

violent and non-violent pretrial detainees in double-bunked cells which failed to protect inmates, like Richard Hightower, as expected by a reasonable correctional administrator." J.A. 272. Mr. Leach further observed that "mixing violent and non-violent inmates is a regular occurrence," at the Curran-Fromhold Correctional Facility during the intake housing processes. J.A. 280. He added that this policy effectively "mix[ed] predator with prey, contrary to the intent of an effective classification system." J.A. 288.

In her deposition, Sgt. Major confirmed Mr. Leach's opinion that the City's intake policy was creating a substantial risk to Mr. Hightower. She testified that Mr. Tyler's assault on Mr. Hightower did not reflect personal animosity. It "had to do with [Mr. Hightower] was just in the cell. It could have been anybody." J.A. 201. Seargent Major added that the attack could have been avoided had the two men been segregated by security risk. *Id.*

This record suffices to create a factual dispute concerning whether the City's policy or custom of commingling violent and non-violent pretrial detainees violated Mr. Hightower's Fourteenth Amendment rights. As noted above, the Fourteenth Amendment provides that a pretrial detainee has a constitutionally-protected liberty right "to be free from physical attack and injury" by fellow prisoners. *Davidson*, 752 F.2d at 822. A Fourteenth

Amendment violation may be proved against a municipality through evidence of an unconstitutional policy or custom, where the municipality's actions or failures rise to a level of deliberate indifference that caused the harm the plaintiff has suffered. *Forrest*, 930 F.3d at 105–06. A plaintiff can show deliberate indifference if (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. *Id.*

Here, the facts (if believed) would permit a jury to conclude that every prong has been met when the prongs are construed in the light most favorable to the plaintiff. The City had a policy in place by which it assessed pre-trial detainees for risk of violence and then failed to consider that assessment when determining housing assignments in the intake area of the Curran-Fromhold Correctional Facility; assignments were made instead on a first-available basis. J.A. 559. The City knew of the substantial risk of injury to detainees assessed non-violent when housed with detainees assessed violent, including based on past experiences with such violence. J.A. 413, 429–30. As Mr. Leach explained, a non-violent detainee is the "prey" to the

violent detainee's "predator." J.A. 288. The City knew or should have known that non-violent detainees had a "particular vulnerability" to assaultive behavior by violent detainees in the close-quarters of a cell. *See Colburn I*, 838 F.2d at 669. Given this knowledge, the City had a Fourteenth Amendment obligation "not to act with reckless indifference to that vulnerability." *Id*. This record testimony gave rise to an inference of the City's deliberate indifference to the safety of non-violent detainees such as Mr. Hightower. At a minimum, the facts sufficed at least to permit his claim to move forward.

The record also permits a conclusion in Plaintiff's favor on the issue of causation as well. In particular, the record shows that Mr. Tyler had an alarming criminal history and repeatedly engaged in violent, assaultive conduct while incarcerated. Mr. Tyler's classification evaluation yielded a score of "17," placing his in the highest risk "close" custody status. J.A. 358. The City knew of Mr. Tyler's dangerous propensities in advance of making the decision to house him with a non-violent, "minimum security" detainee like Mr. Hightower. J.A. 354. Yet the City gave no consideration to Mr. Tyler's assessment when applying its policy of first-available bed, housing him with Mr. Hightower. It was the City's very policy or custom that led to Mr. Tyler's insertion into Mr. Hightower's cell whereupon he preyed upon

Mr. Hightower's vulnerability. As Mr. Leach noted, "At the time of the assault, inmate Tyler had already been classified a 'close' custody inmate for several weeks. But he was still permitted to be housed with Mr. Hightower. This failure, coupled with the custom and practice of mixing violent and non-violent inmates while in the intake/quarantine housing area, resulted in Mr. Hightower being assaulted by Mr. Tyler." J.A. 294. Summary judgment should have been denied for this reason as well.

### D. The district court erred by dismissing Mr. Hightower's claim against the City.

In dismissing Mr. Hightower's claim against the City, the district court reasoned that the City's policy or custom of housing violent and non-violent pretrial detainees together was not facially unconstitutional and did not create an obvious risk of harm. The district court made several mistakes when reaching this decision.

*First*, the district court reasoned it was "entirely speculative to assume that housing a person classified as 'close' custody with a person of lower custody status inherently poses a substantial risk of serious harm to the inmate of lower custody status." J.A. 31. Viewing the evidence in a light favorable to Mr. Hightower, there was nothing speculative about this risk.

The record contained evidence that commingling violent and non-violent inmates was a concrete safety concern. J.A. 413, 429–30. The record showed that the very purpose of a housing classification policy was to promote the "personal safety of inmates and staff." J.A. 219. Mr. Hightower also produced expert testimony for the above-propositions as well. J.A. 272, 288. This record evidence and the City's knowledge about the dangers of commingling violent and non-violent pre-trial detainees provides important context for the City's commingling policy. Whether a jury would agree with Mr. Hightower's view of the evidence goes to weight and credibility. This is especially true given this Court's validation in *Colburn* and *Palakovic* of similar constitutional claims. As such, summary judgment ought not have been granted on the basis that the dangers highlighted by Mr. Hightower's experience were "speculative."

*Second*, the district court held that the Curran-Fromhold Correctional Facility policy of commingling detainees with different classifications in the intake area of the facility did not create an obvious risk of harm and hence that the City lacked notice of a potential constitutional violation. Viewing the record in the light favorable to Mr. Hightower, the record permitted the conclusion that the City knew perfectly well about the dangers associated

with comingling inmates of different custody designations; hence the creation of such designations in the first place, and also of the risk assessments undertaken immediately following detention. J.A. 413, 429–30. The City likewise knew about Mr. Tyler's long history of violence that included violence against fellow inmates going back to October 2017. J.A. 358-62. Fact and expert witnesses testified that placing Mr. Tyler in a cell with Mr. Hightower obviously increased Mr. Hightower's risk of harm given Mr. Tyler's pending charges, prior criminal history, prior institutional behavior, age, length of sentence, medical and psychological histories, recidivism score, and other salient factors. J.A. 272, 288. The record reflects that an inmate like Mr. Tyler with known propensities for violence would not have been housed in general population with a non-violent inmate like Mr. Hightower. J.A. 413, 429–30. That being the case, a jury would have ample reason to question whether Mr. Hightower's liberty rights were adequately protected by placing his together with Mr. Tyler following a ready-assessment of their respective risk of violence. In the end, the jury should be availed the opportunity to decide these important questions of fact and law.

## VI. CONCLUSION

The Court should reverse the order dismissing Plaintiff's claim against the City of Philadelphia.

Respectfully submitted,

/s/ Ruxandra M. Laidacker

Thomas R. Kline
Charles L. Becker
Colin Burke
Ruxandra M. Laidacker
Michelle A. Paznokas
*Attorneys for Plaintiff-Appellant*

Dated: March 27, 2024

## COMBINED CERTIFICATIONS

*Bar membership*. I am a member of the bar of the United States Court of Appeals for the Third Circuit.

*Word limit*. This brief includes 6,643 words as calculated with the word-counting feature of Microsoft Word and including the parts of the brief specified in F.R.A.P. 32.

*Typeface and typestyle*. This brief complies with the typeface and typestyle requirements of F.R.A.P. 32. It has been prepared with Microsoft Word using 14-point Book Antiqua font, which is a proportionally spaced typeface.

*Filing*. I electronically filed this brief with the Court in "pdf" format and caused an original and seven paper copies to be delivered to the Clerk's Office. The brief as provided to the Court in pdf format is identical to the paper copies filed with the Court.

*Virus check*. The pdf version of this brief has been scanned for viruses with Vipre Business software. The software confirmed that the pdf file contained no viruses.

/s/ Ruxandra M. Laidacker

Dated: March 27, 2024 Ruxandra M. Laidacker

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was served via the Court's electronic case management system upon all counsel of record.

/s/ Ruxandra M. Laidacker
Ruxandra M. Laidacker

Dated: March 27, 2024

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

No. 24-1116

---

RICHARD HIGHTOWER,

Plaintiff-Appellant,

v.

CITY OF PHILADELPHIA, SERGEANT SHANTEL MAJOR, and CORRECTIONAL OFFICER JOHN DOES 1–10,

Defendants-Appellees.

---

**JOINT APPENDIX**
**Volume I, Pages 1-38**

---

On appeal from an Order of the United States District Court for the Eastern District of Pennsylvania, entered on December 22, 2023, in Docket No. 2:21-cv-04075-KSM

---

Thomas R. Kline
Charles L. Becker
Colin Burke
Ruxandra M. Laidacker
Michelle A. Paznokas
**Kline & Specter, PC**
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
*Attorneys for Richard Hightower*

# TABLE OF CONTENTS

Page

## VOLUME I

Order (granting summary judgment)
entered December 22, 2023 ........................................................ 1

Memorandum Opinion
entered December 22, 2023 ........................................................ 2

Notice of Appeal
dated January 18, 2024 ........................................................ 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RICHARD HIGHTOWER,**<br>Plaintiff,<br>*v.*<br>**CITY OF PHILADELPHIA, et al.,**<br>Defendants. | **CIVIL ACTION**<br>**NO. 21-4075-KSM** |

**ORDER**

**AND NOW**, this 22nd day of December 2023, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 55), Plaintiff's response (Doc. No. 59), and Defendants' Reply (Doc. No. 62), following oral argument, and for the reasons set forth in the accompanying Memorandum, it is **ORDERED** as follows:

1. Defendants' motion is **GRANTED** in its entirety. Plaintiff's claims against Defendants are **DISMISSED with prejudice.**
2. The Clerk of Court is directed to **CLOSE** this case.

**IT IS SO ORDERED.**

/s/ Karen Spencer Marston
______________________________
KAREN SPENCER MARSTON, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RICHARD HIGHTOWER,**<br>Plaintiff,<br>*v.*<br>**CITY OF PHILADELPHIA, et al.,**<br>Defendants. | **CIVIL ACTION**<br>**NO. 21-4075-KSM** |

**MEMORANDUM**

**Marston, J.** **December 22, 2023**

In this tragic case, Plaintiff Richard Hightower was violently attacked by his cellmate during intake processing at Curran-Fromhold Correctional Facility ("CFCF"). Hightower suffered severe and permanent injuries rendering him a quadriplegic. (Doc. No. 54 at ¶¶ 79, 99.) Hightower brings this action against Defendants City of Philadelphia (the "City") and Sergeant Shantel Major (collectively, "Defendants"), under 42 U.S.C. § 1983. (*See id.* at ¶¶ 101–29.) Hightower alleges that, by housing him with a violent cellmate who was classified as "close" custody, and failing to intervene after his cellmate threatened to kill him, Defendants failed to protect him, acted with deliberate indifference to his safety, and violated his Fourteenth Amendment rights. (*Id.*; *id.* at ¶ 98.)

Defendants now move for summary judgment, arguing that (1) Major is entitled to summary judgment on Hightower's constitutional Fourteenth Amendment claim, or in the alternative, qualified immunity is appropriate; and (2) the City is entitled to summary judgment on Hightower's *Monell* claim. (Doc. No. 55.) Hightower opposes the motion. (Doc. No. 59-1.) For the reasons discussed below, the Court grants Defendants' motion.

## I. Background

### A. Curran-Fromhold Correctional Facility

CFCF is a Philadelphia correctional facility where both Hightower and his cellmate, Andrew Tyler, were housed as pretrial detainees. (*See* Doc. Nos. 59-10, 59-14.) Upon the arrival of an inmate to CFCF and prior to entering the general population, a new inmate must be (1) medically cleared for communicable illnesses, such as tuberculosis, and (2) classified within one of the following custody statuses: community, minimum, medium, and close.[1] (Doc. No. 59-12 at 124:5–8; Doc. No. 59-15 at 12:15–24, 57:18–58:2; Doc. No. 56-10 at 3.) Once an inmate receives his medical clearance and classification status, CFCF finds an available bed for the inmate's permanent housing assignment. (Doc. No. 59-12 at 19:2–24.)

During the intake period inmates are generally not separated based on custody status. (*See* Doc. No. 59-15 at 58:8–11 (Deputy Chief Beaufort testifying that inmates are uniformly classified as "intake class" during intake prior to receiving a formal classification); Doc. No. 59-12 at 41:2–16 (Deputy Warden Bowers testifying that "when [inmates] first come in, we don't know their classification level at that point. So ideally, what happens in quarantine . . . is they are housed together until we know the classification status . . . that's what happens when they go into general population. Then they would be housed accordingly . . . . [B]ut we wouldn't know that during the intake/quarantine housing until they are classified."); *id.* at 49:19–50:1 (Deputy Warden Bowers testifying that the only consideration in placing inmates in quarantine cells is housing availability).) However, there are special exceptions that could warrant separation of

[1] "Close custody" status is assigned to inmates with the highest classification scores, which are calculated using metrics such as most serious charge/conviction held, past institutional behavior, prior convictions, age at reception, sentence length, and recidivism score; "community custody" is assigned to the inmates with the lowest scores. (Doc. No. 56-10 at 3–4.)

inmates during the intake period, such as if the individual is a high-profile figure in the media, or if they are recognized as a "frequent flier" in CFCF. (*See* Doc. No. 56-9 at 2 (Philadelphia Prisons Policies & Procedures 4.A.4 stating that "[g]uidelines for differentiating single cell assignments as opposed to routine cells . . . will be as follows: [1] Health care staff may prescribe single cell for inmates who they deem to have need . . . for psychological, health, or substance abuse-related reasons; [2] Staff will ensure that all inmates who require stringent security for behavioral or legal reasons are housed separated in designated areas in the quarantine unit"); Doc. No. 59-15 at 17:4–20:21, 22:6–24 (Deputy Chief Beaufort describing circumstances when an inmate may be separated from other inmates during the intake period); *see also* Doc. No. 59-12 at 50:15–24 (Deputy Warden Bowers testifying that an inmate may be housed alone during the intake period in the presence of certain mental health concerns).)

In general, inmates are typically classified within 72 hours of arrival at CFCF (Doc. No. 59-16 at 26:19–20), and then are moved to their permanent housing assignment based on cell availability in general population.[2] (Doc. No. 59-12 at 28:18–29:7.) Even if an inmate is classified before receiving his medical clearance, the inmate will not be moved to a different cell during the intake processing period to be housed with an inmate of the same classification status. (Doc. No. 59-12 at 42:17–24 (Deputy Warden Bowers testifying that during the intake period, inmates who may have already been designated close custody would not be separated from unclassified or minimum custody inmates); *see also id.* at 43:8–10 ("They weren't moved until they were medically cleared and classified together.").) In general population, conversely,

---

[2] Deputy Warden Bowers testified that once an inmate receives medical clearance and is classified, they are reassigned and moved to general population ideally within three to five hours. (Doc. No. 59-12 at 29:22–32:1.) However, Director Thomas noted that it is possible that an inmate may remain in intake processing even after receiving his classification for days or weeks due to lack of housing availability in general population. (Doc. No. 56-16 at 54:4–55:19.)

inmates are typically separated by classification status in part as a safety measure.[3] (*See* Doc. No. 56-10 (Philadelphia Prison Policy & Procedure 4.B.1 stating, "[i]t is the policy of the [Philadelphia Prison System] to classify inmates according to a system that contributes to public safety and *provides for the personal safety of inmates* and staff" (emphasis added); *see also* Doc. No. 59-15 at 30:14–18 (Deputy Chief Beaufort testifying that close custody and minimum custody inmates are separated in part to protect the safety of the inmates).)

### B. Hightower and Tyler Intake Processing – September 13 – 15, 2019

On September 13, 2019, at approximately 8:17 p.m., Hightower arrived at CFCF where he was held on non-violent charges. (Doc. No. 54 at ¶ 54.) He was housed in Unit B1, Pod 4, Cell 21, Bed 3 (top bunk) in the CFCF intake unit pending his medical evaluation and classification status.[4] (*Id.* at ¶ 55; Doc. No. 56-5.) At the time, Hightower was a 58-year-old male, standing at 5 feet, 9 inches tall, and weighing approximately 165 pounds.[5] (Doc. No. 59-7.)

On September 14, 2019, at approximately 5:40 a.m., after spending time in the infirmary, Tyler entered intake processing and was assigned to Bed 1 (bottom bunk) in the same cell as Hightower.[6] (Doc. No. 56-5.) At the time, Tyler was a 25-year-old male, standing at 6 feet tall,

---

[3] Director Thomas testified that the "classification system is used for the health and safety of not only inmates, but staff as well, and to utilize housing and resources more efficiently." (Doc. No. 59-16 at 35:12–16.)

[4] Cell 21 measures approximately 6 feet by 9 feet in dimension. (Doc. No. 56-2 at 31:1–4.)

[5] Hightower was classified as Minimum Security on September 15, 2019 at 4:58 a.m. (Doc. No. 59-14.)

[6] Tyler initially arrived at CFCF on August 19, 2019, but during intake processing was observed with "multiple stab wounds to his body," and transferred to the infirmary for medical treatment. (Doc. Nos. 59-8, 59-9.) On August 21, 2019, Tyler was classified as close security. (Doc. No. 59-10.) The record indicates that Tyler should not have been returned to intake after receiving medical treatment. (*See* Doc. No. 59-9 (explaining that Tyler had already been classified and medically cleared *before* returning to CFCF; "[t]he medical department is not sure why inmate Anthony Tyler was placed back in quarantine upon his return to Curran-Fromhold Correctional Facility.").)

and weighing approximately 182 pounds. (Doc. No. 59-8.) Tyler was held on violent charges, including aggravated assault, criminal trespass, terroristic threats, recklessly endangering another person, burglary, possessing an instrument of crime, simple assault, and criminal mischief. (*Id.*) Tyler had a history of violent behavior and of violence against other inmates and staff.[7] (Doc. No. 59-18.) He also suffered from a serious mental health illness noted as Serious Mental Illness ("SMI") in his admission records. (*See, e.g.*, Doc. Nos. 59-10, 59-19.)

While Hightower and Tyler were housed together as cellmates, Tyler displayed aggression on two separate occasions prior to the horrific assault taking place. First, when Tyler entered Cell 21 and while a correctional officer was still present, Tyler immediately began kicking on the door and verbally threatening Hightower. (*See* Doc. No. 56-2 at 28:24–30:5 (Hightower testifying that he and Tyler got into an argument, with Tyler threatening, "'I was in the Air Force and I know I will 'F' you up. I'm heavier than you and I will 'F' you up in here.'").) Hightower states that the correctional officer witnessed this encounter because the officer stayed for a minute after bringing Tyler to the cell and told Tyler to calm down before leaving. (*Id.* at 77:4–78:11.) Hightower testified that he responded to Tyler's threats, "[w]ait a minute, . . . I don't even know you man, so why you come in here telling me you'll 'F' me up?" (*Id.* at 30:9–17.)

A second incident followed approximately twenty minutes after Tyler arrived in the cell

---

[7] Tyler's institutional misconduct report includes descriptions of multiple incidents of violent behavior, including: (1) an October 19, 2016 institutional fighting charge for an incident in which he was fighting with another inmate while returning to his housing area; (2) a June 7, 2017 institutional charge for "screaming and kicking the walls," and "threaten[ing] to harm other inmates and banging on his bed"; (3) a July 7, 2017 institutional charge for fighting with another inmate, during which both inmates were injured; (4) a September 27, 2017 institutional charge for fighting with another inmate and banging on the gate of a cell; and (5) an October 9, 2017 institutional charge for violently beating his cellmate. (*See* Doc. No. 59-18.)

when Tyler asked a correctional officer to turn on the television.[8] (*Id.* at 33:20–33:23.) The intake cell, which has a rectangular glass windowpane, permitted Tyler to watch television from inside his cell, with the television on the outside of the cell. (*Id.* at 35:22–36:1; Doc. No. 56-3 at 146:10–13.) At the time Tyler asked the correctional officer to turn on the television, Hightower was trying to sleep, and asked the officer to turn down the volume. (Doc. No. 56-2 at 33:24–34:2 ("So she turned on the TV and I said, Wait a minute, I'm trying to sleep, can you turn the TV down a little bit?").) Tyler responded to Hightower's request to lower the television's volume with additional threats of aggression. (*See id.* ("He talking [sic] about 'F' you, M-effer. He said 'F' you and all that. He's saying that in front of the corrections officer. He said I'm going to 'F' you up. You watch.").) The verbal altercation between Tyler and Hightower over the television continued even after the correctional officer left. ((*Id.* at 36:11–18 (Tyler stating, "I'm going to f*** you up, you watch").) Hightower states that he told Tyler, "[i]f you going to do something to me, do it to me now." (*Id.*) Hightower admits that he did not report any of these verbal threats to Major (or any other CFCF official), nor did he express any concern for his safety. (Doc. No. 56-2 at 39:12–15 (Hightower testifying that he did not "tell anyone at the prison [that he] thought [Tyler] was going to attack [him]").)

**C. Tyler's Assault of Hightower ("the Assault")**

On September 15, 2019, Major was assigned to work an overtime shift as a correctional

[8] Although Hightower does not remember the identity of either correctional officer (Doc. No. 56-2 at 34:13–15), he states his recollection that the officer who turned on the television had "three yellow stripes on the side of her arm," so Hightower believes she was a sergeant. (*Id.* at 77:2–5.) He also provides a physical description for this correctional officer of a medium height, black woman. (*Id.* at 35:3–6.) But Hightower concedes that Major was *not* the individual who heard any of Tyler's prior verbal threats. (Oral Arg. Tr. at 11:23–25 (Mr. Burke: "Your Honor, in fairness I'm actually not going to be arguing that the prior communications can be attributed to [Sergeant Major.").)

officer from 3:00 to 11:00 p.m.[9] (Doc. No. 56-3 at 99:16–19.) At approximately 4:07 p.m., she signed on to duty in Unit B1, Pod 4, where Hightower and Tyler were housed. (Doc. No. 56-4 at 3; Doc. No. 56-3 at 123:11–21.) While working her shift, Major made multiple tours of the pod, noting that everything appeared in order. (*See* Doc. No. 56-4 at 3 (prison log including multiple notations entered by Major stating "toured unit: appears in order").) Major testified that she did not interact with Hightower or Tyler on September 15, 2019 prior to the assault. (*Id.* at 121:1–14, 124:6–13 ("[A]t no time prior to me going to lunch did inmate Hightower or Mr. Tyler inform – I didn't even have a conversation with them. When I did my tours and I spoke to an inmate, that cell did not interact with me at all. And in the time of my tours, it was nothing going in those cells."); *id.* at 125:20–22 ("So when I went up to the cell [just prior to the assault], that will be my first time interacting with [Tyler].").) Several hours after she began her shift, Major took her lunch break and resumed her tours of the pod at approximately 7:38 p.m. (*See id.* (noting that Correctional Officer T. Henderson toured the pod at 7:25 p.m. and at 7:33 p.m. before Major resumed her tours at 7:38 p.m.).) Soon after, around 8:25 p.m., Major heard someone "banging on [a cell] door like a crazy person."[10] (Doc. No. 56-3 at 124:14–17, 125:9–

---

[9] CFCF was understaffed on September 15, 2019, the date of Tyler's horrific assault of Hightower. (Doc. No. 56-3 at 100:5–17 ("But because they were short-staffed, they asked me to go onto that pod, and I worked by myself. Because that is a two-man post. It's supposed to be two people on that pod at that time.").) Each "pod" in CFCF, housing up to 80 inmates, is typically staffed by multiple correctional officers. (*Id.*; *id.* at 100:21–101:12; *see also* Doc. No. 59-15 at 75:4–76:20 (Deputy Commissioner Beaufort noting that all four individuals assigned to work in Pod 4, where Hightower and Tyler were housed, had called out on September 15, 2019).) Major was the only person staffed in Pod 4 at the time of the attack. (*Id.*)

Because Major was only operating in a correctional officer capacity at the time of her overtime shift, she could not make supervisory decisions even though her formal title was that of Sergeant. (*Id.* at 96:5–9; 144:10–14 ("[E]ven though I'm a sergeant, I'm working at the capacity of an officer. So I can't make the judgment to open up [the cell]. I have to get approval from the sergeant that has access to the whole building.").)

[10] Major noted that she is accustomed to prisoners banging on doors. (Doc. No. 56-3 at 132:19–24 ("Q: The way he was banging on the door, was that louder than you're typically used to hearing? A: No. I

13.) She called out, "[w]ho banging on the door?" and an unidentified person responded that the banging was coming from Cell 21. (*Id.* at 128:14–20.) Before heading toward Cell 21, Major checked her computer for records on the inmates in Cell 21 and noticed that one inmate was listed as SMI, but she did not know which inmate had this notation. (*Id.* at 130:3–6, 131:7–23, 181:19–182:1.) About one minute after the banging started, Major reached Cell 21.[11] (*Id.* at 128:8–14.)

When she reached the cell, Major spoke to Tyler face-to-face in a calm voice and asked, "[w]hy are you banging on the door?" (*Id.* at 141:14–23, 146:8–146:13.) Tyler refused Major's orders to stop kicking the door. (Doc. No. 59-11 at 2.) He complained to Major that his cell and "cellee" (i.e., Hightower) were "dirty" and demanded to be moved from that cell. (Doc. No. 56-3 at 142:2–5.) Major testified that she observed that the cell was dirty because there were leftover trays of food and that Tyler himself appeared "dirty . . . like he hadn't washed up for months." (*Id.* at 142:24–143:15.) She further observed that Tyler's cellmate, Hightower, appeared to be sleeping, as he was in the top bunk with the covers over his head. (*Id.* at 143:19–21, 147:1–8.) Although Major testified that she recalled Tyler speaking calmly (*id.* at 142:6–11, 254:1–6), the video incident review report notes that "Inmate Tyler *yelled* for [Major] to remove his cellmate from the cell" and "inmate Tyler refused orders to stop kicking his door."[12] (Doc.

---

work in a prison. They bang on the doors all the time loud and obnoxious and ignorantly.").)

[11] The video incident review report notes that while approaching the cell, Major unholstered her pepper spray. (Doc. No. 59-11 at 3.) However, Major testified that she believed the incident review report was incorrect. (Doc. No. 56-3 at 248:1.) After reviewing the video footage of the assault, Major testified that the video showed her motion with her left hand, but she kept her pepper spray on her right side because she is right-handed, "[s]o that report was wrong." (Doc. No. 56-3 at 247:7–248:1.)

[12] The surveillance footage of the pod underlying the video incident review report was not provided as part of the record; the Court only has access to Deputy Warden Bowers' report analyzing the video footage. (Doc. No. 59-11.) The video footage does not have sound (Doc. No. 59-12 at 73:24–74:2), so the Court must infer that Tyler's gestures were sufficient to surmise that he was yelling. Given this disputed fact and the standard at summary judgment that disputes of facts must be viewed in the light

No. 59-11 (emphasis added).) Major denied Tyler's request and informed Tyler that "I can't make no moves [until the] 7:00 to 3:00 [shift], but what I can do is when [I] get the approval to open up, I'll let you clean your cell." (Doc. No. 56-3 at 144:1–4.) Major stated that Tyler repeated his remarks about the cell being dirty more than once. (*Id.* at 149:7–18, 150:16–151:4.) Then Tyler stated that if he could not get out of his cell he would kill his cellmate, Hightower. (*Id*. at 146:14–19.)

Within seconds of making this threat to kill Hightower, Tyler ran from the door of the 6-by-9-foot cell (Doc. No. 56-2 at 31:1–4), where he was speaking to Major (Doc. No. 56-3 at 147:5–13), over to Hightower, who was still asleep on the top bunk, and yanked him off the bed and onto the cement floor. (*Id.* at 147:20–148:7, 150:10–15, 153:1–7.) Tyler proceeded to brutally punch and kick Hightower in the face, upper body, and chest. (*Id.* at 230:18–22.) Major immediately radioed for backup support. (*Id.* at 151:18–24.) Within approximately 52 seconds after reaching the cell, having her initial conversation with Tyler, and radioing for backup, Major entered the cell and pepper sprayed Tyler in the face. (*See* Doc. No. 59-11 (noting that Major arrived at Cell 21 at 20:25:51 and that she opened the cell door and deployed pepper spray at 20:26:43); Doc. No. 56-3 at 152:1–17 (Major testifying that "when I radio, I seen that people were coming on the rotunda, and then . . . I immediately went in the cell and pepper sprayed him. . . . Q: Is it fair to say that you waited until you saw backup before entering the cell? A: It was fair."); Doc. No. 59-20 (incident report stating that Major "administered one burst [of pepper spray] to inmate Tyler's facial area").) After pepper spraying Tyler, Tyler "came toward[s]" Major and she left the cell. (Doc. No. 56-3 at 197:18–198:6.) Major testified that she could not have physically intervened sooner because Tyler made the threat and then took action within

most favorable to the non-movant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the Court assumes that Tyler was agitated in his interaction with Major.

seconds. (*Id.* at 169:18–23.)

About seven seconds after Major left the cell, backup officers arrived and Tyler was handcuffed and taken to the medical unit, while Hightower was transported by helicopter to Jefferson Torresdale Hospital. (Doc. No. 59-11 (explaining that backup officers arrived at 20:26:55 and Tyler was handcuffed and escorted out of the unit at 20:27:19); Doc. No. 56-2 at 36:20–22.) Doctors worked to treat Hightower's injuries, but he was left paralyzed. (Doc. No. 56-3 at 43:17–23.) Hightower will continue to suffer from these serious injuries for the rest of his life. (*See id.* at 42–59.)

## II. Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## III. Analysis

Hightower brings claims pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his rights under the Fourteenth Amendment. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

"To state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 U.S. Dist. LEXIS 84428, *9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)). "Municipalities and other local government units, including private corporations providing medical services under contract with a state prison system, are included among those persons to whom § 1983 applies." *Powell v. Cmty. Educ. Ctrs.*, No. CV 17-3729, 2018 WL 1210524, at *3 (E.D. Pa. Mar. 8, 2018) (citing *Palakovic v. Wetzel*, 854 F.3d 209, 232 (3d Cir. 2017); *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978)). However, § 1983 does not provide a cause of action under the theory of *respondeat superior. Monell*, 436 U.S. at 694. Instead, to state a claim for municipal liability, "a plaintiff must establish that: (1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom." *Simpson v. Ferry*, 202 F. Supp. 3d 444, 452 (E.D. Pa. 2016) (citing *Monell*, 436 U.S. at 692–94).

Hightower asserts that Major is liable under the Fourteenth Amendment for failing to protect Hightower from harm caused by another inmate. (Doc. No. 59-1 at 5–15.) Hightower also asserts that the City is liable because it had an unconstitutional policy or custom of comingling violent and non-violent pretrial detainees. (*Id.* at 15–21.) The Court addresses each argument in turn.

### A. Fourteenth Amendment Failure to Protect Claim Against Major

#### 1. Constitutional Violation

Because Hightower was a pretrial detainee at the time of the assault, the Fourteenth Amendment's Due Process Clause governs his failure to protect claims rather than the Eighth Amendment's prohibition on cruel and unusual punishment. *See A.M. ex rel J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 584 (3d Cir. 2004). "[I]t is clear that detainees are entitled to no less protection than a convicted prisoner is entitled to under the Eighth Amendment." *Id.* (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "[C]ourts apply the same deliberate indifference standard to a pretrial detainee's failure to protect claim pursuant to the Fourteenth Amendment, as to the same claim brought by a sentenced prisoner pursuant to the Eighth Amendment." *Casiano v. Russell*, No. 5:21-cv-918, 2021 U.S. Dist. LEXIS 43587, at *6 (E.D. Pa. Mar. 9, 2021) (citing *Edwards v. Northampton Cnty.*, 663 F. App'x 132, 135 (3d Cir. 2016)).

Under the Eighth Amendment, prison officials must provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In particular, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners" because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 833–34 (internal citations and quotations omitted). Such claims against prison officials for failure to protect against violence by other inmates are often labelled as "failure to protect" claims. *See Ayres v. Ellis*, No. CIV.A. 09-4247FLW, 2009 WL 3681892, at *5 (D.N.J. Nov. 4, 2009).

However, "not . . . every injury suffered by one prisoner at the hands of another [] translates into constitutional liability for prison officials responsible for the victim's safety."

*Farmer*, 511 U.S. at 834. "To state a claim for damages against a prison official for failure to protect . . . an inmate must plead facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), abrogated on other grounds as recognized in *Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020) (citing *Farmer*, 511 U.S. at 834). "Deliberate indifference" is a "subjective standard"—the "prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Id.* (citing *Beers–Capitol v. Whetzel,* 256 F.3d 120, 133 (3d Cir. 2001)). "It is not sufficient that the official should have known of the risk." *Id.* (citing *Beers–Capitol,* 256 F.3d at 133). However, a plaintiff can prove an official's actual knowledge through circumstantial evidence; for instance, a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* Here, Hightower alleges that Major (1) was aware of a substantial risk of harm to Hightower because Tyler threatened to kill him, (2) was deliberately indifferent toward this substantial risk, and (3) that deliberate indifference caused Hightower's harm. (Doc. No. 59-1 at 5-13; Doc. No. 54 at ¶¶ 101–19.)

As mentioned earlier, *supra* at n.7, Hightower now concedes that Major was *not* present for *any* of the prior verbal threats by Tyler towards Hightower. (Oral Arg. Tr. at 11:23–25.) Still, Hightower argues that because Tyler told Major he was going to kill Hightower mere seconds before actually taking action, Major was aware of a substantial risk of harm to Hightower and obligated to either instantly use her pepper spray on Tyler, or immediately unlock the cell and separate Tyler and Hightower. (*Id.* at 35:10–22; Doc. No. 59-1 at 10 ("[A] reasonable correctional officer would have immediately opened the cell door and removed either

Mr. Tyler or Mr. Hightower from the cell and prevented the assault.") (citing Doc. No. 56-13 at 15).) Hightower argues that Major had a duty to immediately act to protect Hightower because the combined facts show that: (1) Major knew at least one inmate in Cell 21 was listed as SMI (Doc. No. 56-3 at 130:3–6, 131:7–23, 181:19–182:1); (2) Tyler had been banging on the cell door "like a crazy person" (*id.* at 124:14–17, 125:9–13); (3) Tyler was agitated and demanding to be removed from the cell because his cell and cellmate (Hightower) were dirty (Doc. No. 59-11; Doc. No. 56-3 at 124:14–17, 125:9–13, 142:2–5); (4) Tyler paused between threatening to kill Hightower and actually yanking Hightower off the top bunk to the ground and violently assaulting him[13] (Doc. No. 56-3 at 160:13–20, 151:5–15); and (5) Major knew Hightower was "sleeping on the top bunk and defenseless" (Oral Arg. Tr. at 59:12–13). In sum, Hightower argues that "Major had a realistic and reasonable opportunity to intervene and simply refused to do so" because Major "waited for backup to arrive before entering the cell." (Doc. No. 59-1 at 10–11.)

The Court disagrees and instead finds that these facts are insufficient to support an inference of deliberate indifference. The Third Circuit has held that "threats between inmates are common" and do not, in every circumstance, "serve to impute actual knowledge of a substantial

[13] Hightower argues that Major's deposition testimony regarding the immediacy of Tyler's attack "wreaks of inconsistency." (Doc. No. 59-1 at 11.) Major repeatedly noted during her deposition that Tyler "immediately" attacked Hightower upon uttering his threat. (*See, e.g.*, Doc. No. 56-3 at 147:5–13.) However, at one point during her deposition, when asked why she didn't immediately open the cell door after Tyler's threat, Major testified, "I didn't open the door after the threat because Mr. Hightower was nowhere near him. And there wasn't no altercation. There wasn't no argument." (*Id.* at 160:13–20.) Hightower suggests that this testimony "directly contradicts Defendants' arguments that there was insufficient time to intervene." (Doc. No. 59-1 at 11.) However, the parties do not dispute that only 52 seconds transpired from the time Major reached the cell, exchanged words with Tyler, and then entered the cell and pepper sprayed Tyler. (Doc. No. 59-11.) As the Court must construe disputes of fact in the light most favorable to the non-movant, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, the Court considers whether, under the totality of the circumstances, a pause of no more than 52 seconds between Tyler's threat and Major entering the cell warrants a finding of deliberate indifference by Major. (Doc. No. 59-11); *Bistrian*, 696 F.3d at 373. It does not.

risk of serious harm."[14] *Jones v. Beard*, 145 F. App'x 743, 745 (3d Cir. 2005) (citing *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)); *see also Muniz v. City of Philadelphia,* No. 21-2762, 2023 U.S. Dist. LEXIS 177460, at *13 (E.D. Pa. Sept. 29, 2023) (noting the same). In *Blackstone v. Thompson*, for instance, the plaintiff alleged that the correctional officer defendant failed to protect him from his cellmate after he informed the officer that he was having problems with his cellmate. 568 F. App'x 82, 83 (3d Cir. 2014). The Third Circuit held that "just one communication" by the plaintiff to the correctional officer regarding his difficulties with his cellmate "is not sufficient to permit a reasonable finder of fact to infer that [the correctional officer] both knew of and intentionally disregarded an excessive risk to [the plaintiff's] safety." *Id.* at 84. The court held that "there is no indication in the record that [the correctional officer] made the inference that an excessive risk was present" and there was "no indication in the record that [the plaintiff] told [the correctional officer] of any specific incident or cause of tension between the cellmates from which a greater inference of risk could be drawn." *Id.*

Here, similarly, Major frequently overhears threats from inmates, and there is no indication that she made the actual inference of an excessive threat to Hightower's safety. (*See* Doc. No. 56-3 at 234:5–14 ("Q: Are you permitted to use pepper spray *when someone is threatening to harm someone else*? A: Well, first I have to try to deescalate it and use tactics to deescalate the situation verbally. I can't just automatically just go to pepper spray. If that's the

---

[14] Although Hightower argues Major should have removed Tyler from the cell, CFCF policy states that Major should seek assistance from a supervisor before moving an inmate based on a threat of harm. (*See, e.g.*, Doc. 59-15 at 67:4–69:18 (Deputy Chief Beaufort testifying that if correctional staff learn of cellmate threats of violence, "they have to get a supervisor . . . . The officers do not have the ability to just move someone off their housing area. It has to be done by a supervisor.").) Furthermore, although Hightower argued that Philadelphia Prisons Policy suggests that Major could have pepper sprayed Tyler when he uttered the death threat to Hightower (Doc. No. 59-1 at 11; Doc. No. 59-21), this cannot alone suggest that Major had actual knowledge of a substantial threat to Hightower.

case, I would be pepper spraying *every inmate every day all day.*") (emphasis added); *see also id.* at 165:23 ("I get threatened every day").) She testified that in normal scenarios, she "know[s] that a fight is going to happen" because "you kind of get a heads-up," (*id.* at 90:19–91:13); here, by comparison, Major testified that, "[a]t no given time did I know that Mr. Tyler was going to harm his cellmate until he took action and did it." (*Id.* at 155:13–15.) She further testified that when Tyler made his threat, "he didn't give a chance to perceive anything" or draw any actual inference of harm because he began his assault within seconds. (*Id.* at 150:5–15.)

The accelerated timeline of events leading up to and including the assault supports the finding that Major did not infer that an excessive risk was present.[15] *No more than 52 seconds* elapsed from the time Major reached the cell to the time she pepper sprayed Tyler. (Doc. No. 59-11.) During this time, multiple things happened: (1) Major, who was unaware of any issues between Tyler and Hightower, spoke with Tyler and upon learning of his complaint, explained multiple times that she could not let Tyler out of the cell until the next shift (Doc. No. 56-3 at 141:14–142:5, 1441:1–4, 149:7–18, 150:16–151:4); (2) Tyler then threatened to kill Hightower (*id.* at 146:14–19); (3) less than 52 seconds later, Tyler ran over to the bunk beds and yanked Hightower to the ground and violently assaulted him (*id.* at147:5–148:7, 150:10–15, 153:1–7,

---

[15] The parties do not dispute the following timeline included in video incident review report:

- 20:25:32 Major walks up the steps to the top tier of the pod
- 20:25:51 Major arrives at Cell 21 and Tyler is visible through cell door glass panel
- 20:26:43 Major opens Cell 21 and deploys pepper spray
- 20:26:48 Major resecures Cell 21
- 20:26:55 Backup officers arrive at Cell 21
- 20:27:19 Officers remove Tyler from Cell 21 in handcuffs
- 20:29:48 Additional staff respond to Cell 21

(Doc. No. 59-11 at 3.) The video footage is of the exterior of the unit and there is no camera view inside the cell. (*Id.* at 2.) The full view of the cell is also obstructed by safety bars on the top tier. (*Id.*)

230:18–22); (4) Major immediately radioed for backup (*id.* at 151:18–24); and (5) Major, upon observing backup officers approaching, entered the cell and pepper sprayed Tyler (*id.* at 152:1–17). Given the speed in which this entire incident took place, whatever the extent of Tyler's pause between threatening to kill Hightower and crossing the few feet to yank Hightower off the top bunk bed and violently assault him is insufficient to infer Major had *actual knowledge* of serious harm and was *deliberately indifferent* by failing to mitigate the threat in those seconds before Tyler attacked. *See, e.g.*, *Ogden v. Mifflin County*, No. 1:06-CV-2299, 2008 WL 4601931, at *17 (M.D. Pa. Oct. 15, 2008) (holding that defendant correctional officer was not deliberately indifferent to a serious risk of harm toward the plaintiff inmate when he was attacked by another inmate because the "assault came as a surprise to both [the plaintiff] . . . and prison officials"); *McDowell v. Deparlos*, Civil Action No. 1:15-cv-00487, 2016 WL 423778, at *6–7 (M.D. Pa. Jan. 7, 2016) (rejecting the prisoner plaintiff's assertion that the correctional officer defendants should have been able to hear the plaintiff and the other inmate "quarrelling" and been "alerted . . . that [the other inmate] posed a threat to [the plaintiff]" because "the incident in which [the plaintiff] was injured appears to have been a single, isolated, spontaneous occurrence, and these defendants had no reason to know prior to the incident that [the other inmate] was about to assault [the plaintiff]").

Major was not aware of any of the prior threats made by Tyler, and Hightower concedes that he never explicitly informed anyone, let alone Major, of those threats or voiced a concern for his safety. (*See* Doc. No. 56-2 at 39:12–15 ("Q: Prior to the attack happening, did you tell anyone at the prison you thought he was going to attack you? A: No, I did not."); *see also* Doc. No. 56-3 at 167:18–168:8 (Major testifying that in the three hours she had been on the pod, "nobody saying hey, my cellee, I need to get out this cell, . . . I don't like my cellee, my cellee is

trying to hurt me, or me and my cellee not getting along. Nothing was talked").) This underscores Major's lack of actual knowledge of a substantial risk of harm when Tyler uttered his threat and contributes significantly to the conclusion that Major was not deliberately indifferent. *See Jones*, 145 F. App'x at 745–46 (holding that the plaintiff failed to establish that the guards had actual knowledge of threats of serious harm because even though "Jones told several guards . . . that he and Marshall were not getting along . . . . , the record is devoid of evidence establishing that Jones articulated specific threats of serious harm, or that he made multiple complaints about Marshall to any one guard"); *Ellis v. City of Philadelphia*, No. 18-5046, 2020 U.S. Dist. LEXIS 22968, at *15–16 (E.D. Pa. Feb. 10, 2020) ("Plaintiff's failure to alert prison officials to the personal history and potential animosity between himself and William is fatal to his claim that they failed to protect him in violation of his constitutional rights."); *Muniz*, 2023 U.S. Dist. LEXIS 177460, at *10–11 (holding that "Plaintiff has failed to provide evidence upon which a reasonable factfinder could find that the Correctional Defendants had notice or were actually aware of a substantial risk of serious harm to Plaintiff" because the plaintiff failed to present evidence that he conveyed any fears of harm or specific threats of serious harm to the named correctional defendants themselves).

Last, Major's brief pause to call for backup after Tyler began his violent attack also does not constitute deliberate indifference. *Compare Shelton v. Bledsoe*, No. 3:CV-11-1618, 2012 U.S. Dist. LEXIS 153059, at *20 (M.D. Pa. Oct. 24, 2012) (holding that the record failed to support an Eighth Amendment claim because the inmate-on-inmate fight, the plaintiff's removal, and his medical assessment occurred within a matter of twelve minutes) (vacated on other grounds), *and Bracey v. Harlow*, No. 11-04 E, 2013 U.S. Dist. LEXIS 136670, at *33–36 (W.D. Pa. Aug. 21, 2013) (rejecting the plaintiff's failure to intervene claim, which faulted the

defendants for waiting four minutes to subdue the other inmate, because the incident was called out immediately, several guards responded to secure both inmates and the weapon, within two minutes the plaintiff was removed from the yard and transferred to medical triage, and within another fourteen minutes, he was transported to the medical department for sutures), *with Andrews v. Grabowski*, No. 95-7781, 1997 WL 698136 at *4 (E.D. Pa. Nov. 4, 1997) (holding that the jury could conclude that the officer acted with deliberate indifference when he waited six to eight minutes before even calling for assistance while an inmate attack continued). And, as a single individual working a post typically intended for multiple correctional officers (*id.* at 100:5–17), Major had to look out for her personal safety. (*Id.* at 243:19-21.) Deputy Chief Xavier Beaufort testified that correctional officers, in responding to assaults, "have to take their safety . . . into account first." (Doc. No. 59-15 at 60:6–10; *see also id.* at 70:22–71:2 ("[Correctional officers] can't just run into the melee that's happening because it could be a setup. So they have to take their safety into consideration first.")); *see Holloman v. Neily,* Civ. No. 97–8067, 1998 WL 828413, at *2 (E.D. Pa. Nov. 25, 1998)) (recognizing that "[p]rison guards are not constitutionally required to take heroic measures and risk serious physical harm by intervening immediately in an inmate's . . . assault on another inmate").

This was a horrific attack and Hightower will struggle with his severe injuries the rest of his life. But the law does not permit the Court to be swayed by sympathy. As unjust as it may seem, there is no evidence to support a finding that under these circumstances with no prior knowledge of any threats by Tyler or any reports that Hightower feared for his safety, Major acted with deliberate indifference to a substantial risk of serious harm to Hightower. The Court grants summary judgment as to Major.

**2. Qualified Immunity**

In the alternative, even if a reasonable jury could find that Major acted with deliberate indifference toward a substantial risk of serious harm to Hightower, the Court must grant Defendants' motion for summary judgment as to Major on qualified immunity grounds. "The doctrine of qualified immunity shields government officials from civil liability for constitutional violations only if 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). To determine the applicability of the qualified immunity doctrine, the Court should ask, "do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right?" *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary." *Id.* However, if the facts demonstrate a constitutional violation, then the court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Saucier*, 533 U.S. at 201). This inquiry as to whether the constitutional right was clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. If the officer would not have known that their conduct constituted a constitutional violation, then the Court must grant the defense of qualified immunity. *Id.*

"In the Third Circuit, it is the party asserting the affirmative defense of qualified immunity who bears the burden of persuasion." *Mateo v. Waltz*, No. 3:21-cv-00552, 2023 U.S. Dist. LEXIS 174655, at *14 (M.D. Pa. Sept. 28, 2023) (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)). Thus, here the moving Defendants must show that there was no genuine

dispute of material fact to refute their contention that Major did not violate Hightower's constitutional rights, or show that a reasonable officer could not have known that her conduct constituted such a violation. *Id.*

Defendants assert that Major is entitled to qualified immunity because "it would not have been clear to [] Major that her actions or inactions were unconstitutional." (Doc. No. 55 at 9.) They argue that "[q]ualified immunity insulates prison officials from liability where there is a 'surprise attack' by an inmate on a fellow inmate" and suggest that Major "could not have known she acted unlawfully by immediately calling over radio for backup and medical help." (*Id*. at 10.) First, Hightower responds that Defendants' qualified immunity defense is improperly raised at this stage of litigation, since Defendants "could have included a qualified immunity defense in their Motion to Dismiss," and "Plaintiff would be prejudiced if it were to be determined that [] Major was immune from suit at this late stage in the proceedings, after considerable time and expense have already been incurred." (Doc. No. 59-1 at 13.) Second, Hightower argues, citing *Bistrian*, *v. Levi*, 696 F.3d 352 (3d Cir. 2012), that he has an established "constitutional right to have prison officials protect him from inmate violence."[16] (*Id.* at 14.) Hightower asserts that "[t]o only react to threats of violence after they are carried out is ludicrous and not supported by governing case law." (*Id*. at 15.)

As an initial consideration, the Court holds that Major did not waive a qualified immunity defense merely because she failed to raise it in her motion to dismiss. "Qualified immunity is an affirmative defense, and therefore under Rule 8(c) of the Federal Rules of Civil Procedure it

---

[16] As discussed, Hightower concedes that Major was not present for the previous incidents of aggression by Tyler toward Hightower. (Oral Arg. Tr. at 11:23–25.) Thus, Hightower's argument relying on Major's "conduct in allowing Plaintiff to remain housed with Inmate Tyler" after "the culmination of a series of threatening behavior" by Tyler is no longer valid. (Doc. No. 59-1 at 15.) That said, the Court must still consider whether Major is entitled to qualified immunity based on her failure to immediately engage with Tyler upon hearing him threaten to kill Hightower a few seconds before he acted.

should be asserted in the appropriate responsive pleading. But under established circuit law, the failure to do so does not automatically result in a waiver." *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 209 (3d Cir. 2001) (citations omitted). As long as the plaintiff is not prejudiced in its ability to respond to the immunity defense, there is no waiver "even though a motion for summary judgment is not the most appropriate way to raise a previously unpled defense of immunity." *Id.* (citing *Kleinknecht v. Gettysburg Coll.*, 989 F.3d 1360, 1374 (3d Cir. 1993) and *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991)); *see also Handy v. Palmiero*, No. 17-3107, 2019 WL 3973711, at *5 (E.D. Pa. Aug. 22, 2019) (collecting cases). Here, Major raised qualified immunity as an affirmative defense in her answer to the second amended complaint. (*See* Doc. No. 58 at 19.) And, even if Major had failed to raise the affirmative defense in her answer, the Court would find no waiver as Hightower has not been prejudiced in his ability to respond.

Next, the Court considers whether Major is entitled to qualified immunity assuming, *arguendo*, Major committed a constitutional violation based on her alleged failure to protect Hightower from Tyler's assault. Here, the Court finds that a reasonable officer would not have known that she was constitutionally obligated to pepper spray or remove an inmate immediately upon hearing him utter a death threat or that she was constitutionally obligated to immediately intervene in an inmate assault without pausing to first call for backup assistance. Given these circumstances, Major is entitled to qualified immunity.

The "clearly established" inquiry at the second prong of the qualified immunity analysis asks "whether the right allegedly violated—defined in terms of the 'particularized' factual context of that case—was a 'clearly established statutory or constitutional right of which a reasonable officer would have known.'" *Kedra v. Schroeter*, 876 F.3d 424, 435 (3d Cir. 2017)

(quoting *Beers-Capitol*, 256 F.3d at 142) (cleaned up). For instance, in *Kedra*, the Third Circuit held that the plaintiff's definition of the right as a "broad substantive due process right to be free from unjustified intrusions on personal security . . . defines the right at issue at too high a level of generality." *Id.* at 449. Instead, "in view of the allegations of the complaint," the Third Circuit defined the right as "an individual's right not to be subjected, defenseless, to a police officer's demonstration of the use of deadly force in a manner contrary to all applicable safety protocols." *Id.* The court then proceeded to determine whether the contours of that right are sufficiently clear that a "reasonable officer would understand that what he is doing violates that right." *Id.* at 449–50. Here, Hightower's definition of the right as a "right to have prison officials protect him from inmate violence" is defined too broadly. (Doc. No. 59-1 at 14.) Instead, "in view of the allegations of the complaint," *Kedra*, 876 F.3d at 449, the Court finds that the issue is twofold: (1) an inmate's right to have death threats mitigated immediately through use of force or separation, and (2) an inmate's right to be protected immediately from inmate-on-inmate violence in a holding cell in an understaffed correctional facility, without hesitation on the correctional officer's part to call for backup assistance.

Now, the Court must examine precedent to understand if the contours of this right are sufficiently clear that a "reasonable officer would understand that what he is doing violates that right." *Id.* at 449–50. Courts typically "look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional." *Id.* at 450 (citing *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016)). However, if a general constitutional rule "applies with 'obvious clarity,'" "it is not necessary that there be binding precedent from this circuit." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) and *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 n.4 (3d Cir. 2001)).

The case law in this circuit makes it clear that Hightower had a right to be protected from harm from other inmates if the officer has actual knowledge of a substantial risk of harm. *See Bistrian*, 696 F.3d at 367; *Williams v. Smith*, 507 F. App'x 260, 263 (3d Cir. 2012) (citing *Beers-Capitol*, 256 F.3d at 142 n.15). But Third Circuit case law does not clearly indicate that a correctional officer *must* apply use of force such as pepper spray against an inmate who threatens another inmate; nor does Third Circuit case law clearly indicate that a correctional officer must immediately separate inmates upon hearing a threat of violence of one toward the other.[17] Thus, Major is entitled to qualified immunity even if her failure to pepper spray or remove Tyler from the cell after his death threat constitutes deliberate indifference.

Similarly, Third Circuit case law does not clearly indicate an officer's obligation to break up an inmate attack upon another inmate without delay to call for back up. Significantly, courts in this and other circuits have held that "[p]rison guards are not constitutionally required to take heroic measures and risk serious physical harm by intervening immediately in an inmate's . . . assault on another inmate." *Holloman v. Neily*, No. 97-8067, 1998 WL 828413, at *5 (E.D. Pa. Nov. 24, 1998) (citing *Winfield v. Bass*, 106 F.3d 525, 532-33 (4th Cir. 1997) (en banc), *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995), and *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995)). The *Holloman* court noted that "[c]alling for backup in such circumstances would be a reasonable response." *Id.* (citing *MacKay*, 48 F.3d at 493). *See also Walker v. Roman*, No. 14-1182 (RMB/AMD), 2016 WL 5934692, at *7–8 (D.N.J. Oct. 12, 2016) ("It is undisputed that

[17] And, there are multiple cases in the Third Circuit and other circuits discussing officer liability for excessive use of force in pepper spraying inmates. *See, e.g.*, *Shelton v. Bledsoe*, 522 F. App'x 109, 113 (3d Cir. 2013) (holding that there was a genuine issue of material fact as to whether the application of pepper spray was appropriate against the plaintiff inmate); *Sledge v. Martin*, 1:21-CV-00348-RAL, 2023 U.S. Dist. LEXIS 37285, at *17–18 (W.D. Pa. Mar. 2, 2023) (collecting cases). In light of the fact that other courts have held that the application of pepper spray can give rise to Eighth Amendment liability for the use of excessive force, the law discussing whether Major *must* have pepper sprayed Tyler immediately after his threat was not clearly established.

Plaintiff was assaulted by at least two inmates in a small recreation yard with more than forty other inmates present, with only the two Defendant officers nearby. Defendants were greatly outnumbered by inmates in the yard, and their intervention posed a significant risk to their own safety, and a risk of escalating the incident without sufficient staff to respond. . . . It would not have been clear to a reasonable officer, confronted with several inmates assaulting Plaintiff in the small recreation yard, while dozens of other inmates were present, and bound by the DOC Internal Management Procedures, that his decision to follow such procedures and wait for the response team to arrive before physically intervening in the assault was unlawful or violated a clearly established constitutional right.").

Here, as in *Walker* and in *Holloman*, Major was faced with potentially life-threatening circumstances if she immediately entered the cell to administer use of force against Tyler as he violently assaulted Hightower. (Doc. No. 56-3 at 151:18–24.) Instead, she followed prison policy, immediately called for backup, and then, in less than one minute, entered the cell and pepper sprayed Tyler. (*Id.* at 152:1–17; *see also* Doc. No. 59-11.) Even if Major violated Plaintiff's constitutional right to protection from other inmates, it would not have been clear to a reasonable officer, working alone in a multi-person post, that she was obligated to immediately confront Tyler before even calling for backup, at risk to her own safety. Thus, to the extent a reasonable juror could find Major acted with deliberate indifference toward a substantial risk of serious harm to Hightower, Major is entitled to qualified immunity.

**B. *Monell* Claim Against the City**

Defendants also move for summary judgment regarding Hightower's *Monell* claim pursuant to 42 U.S.C. § 1983, asserting that the City violated his rights under the Fourteenth Amendment. As mentioned previously, "[m]unicipalities and other local government units,

including private corporations providing medical services under contract with a state prison system, are included among those persons to whom § 1983 applies." *Powell*, 2018 WL 1210524, at *3 (citing *Palakovic*, 854 F.3d at 232). Municipal liability under § 1983 cannot be based on *respondeat superior*; rather, it "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Monell*, 436 U.S. at 691–95). To state a claim for municipal liability, "a plaintiff must establish that: (1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom." *Simpson*, 202 F. Supp. at 452 (citing *Monell*, 436 U.S. at 692–94). Under § 1983, a municipal policy is created when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). A custom, on the other hand, does not require a formal proclamation. *Bielevicz*, 915 F.2d at 850. Rather, a custom must constitute a "course of conduct, [that] although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id*. "In other words, custom may be established by proving knowledge of, and acquiescence to, a practice." *Fletcher v. O'Donnell*, 867 F.2d 791, 793–94 (3d Cir. 1989).

Hightower argues that summary judgment is inappropriate on his *Monell* claim because the City has an unconstitutional, "well-settled" "policy or custom of co-mingling violent and non-violent pretrial detainees" in the intake unit of CFCF. (Doc. No. 59-1 at 16, 19.) Hightower does not provide a clear description of the specific policy or custom he challenges—he suggests on the one hand that CFCF's policy for general population inmates, which separates inmates

based on classification, is deficient because it does not extend to the intake unit. (Oral Arg. Tr. at 43:13–16.) Alternatively, Hightower argues that CFCF has a custom of not following the general population policy of separating based on classification in the intake unit. (*Id.*) Ultimately, the Court understands Hightower to assert that CFCF's policy should provide for the reshuffling of inmates within the intake unit once they are classified, but before they receive their permanent housing assignment within general population. (*Id.* at 44:2–14.) In other words, Hightower suggests that if an inmate is classified as "close" custody soon after arriving in intake, as was the case with Tyler, he should be rehoused within the intake unit to share a cell with someone else of the same or similar classification status until he can be moved to general population. (*Id.*; *id.* at 48:18–49:10.) Regardless of whether Hightower proceeds under the policy or custom prong, he cites testimony from various prison officials suggesting that the City had "knowledge of the daily co-mingling of pretrial detainees, including those that are high risk, and the associated risk of violence," (Doc. No. 59-1 at 19), and argues that the City's failure to take precautions against future co-mingling of violent and non-violent pretrial detainees led to Hightower's injury (*id.* at 20–21).

Defendants argue that summary judgment is appropriate and there can be no municipal liability because Hightower fails to show "that the classification system created a risk of harm that was so patently obvious that the municipality must have been aware of a risk of harm, and by failing to act to rectify it, sanctioned the harmful conduct." (Doc. No. 55 at 13 (cleaned up) (citation omitted).) Defendants argue that Hightower cannot establish that his rights were violated solely because he was housed in a cell with another person with a higher classification status, and that Hightower fails to present evidence that any defect in the Philadelphia Department of Prisons' policies for temporary housing of new inmates during intake processing

led to a pervasive pattern of assaults. (Doc. No. 62 at 7; Doc. No. 55 at 13.) Finally, Defendants argue that CFCF did have a policy providing discretion to separately house violent individuals like Tyler in the intake unit, but that failure to follow this policy does not give rise to *Monell* liability. (Oral Arg. Tr. at 20:25–21:8; Doc. No. 56-9 at 2 (policy stating that "[g]uidelines for differentiating single cell assignments as opposed to routine cells . . . will be as follows: [1] Health care staff may prescribe single cell for inmates who they deem to have need . . . for psychological, health, or substance abuse-related reasons; [2] Staff will ensure that all inmates who require stringent security for behavioral or legal reasons are housed separately in designated areas in the quarantine unit").)

To establish *Monell* liability, "a plaintiff must either point to a *facially* unconstitutional policy or must show a pattern of the policy being applied unconstitutionally." *Remlinger v. Lebanon County*, No. 1:18-CV-00984, 2022 U.S. Dist. LEXIS 201793, at *11–13 (M.D. Pa. Nov. 4, 2022) (citing *Brown v. City of Pittsburgh*, 586 F.3d 263 at 292 (3d Cir. 2009)) (emphasis in *Remlinger*). Hightower fails to specify in his briefing materials whether he is arguing that the policy or custom is facially unconstitutional or that it has caused a pattern of constitutional violations. (*See generally* Doc. No. 59-1.) At oral argument, Plaintiff's counsel stated that his argument was a "hybrid." (Oral Arg. Tr. at 48:1–4.) Thus, the Court considers first whether the policy or custom is facially unconstitutional, and then whether it caused a pattern of constitutional violations.

**1. Facially Unconstitutional**

To determine whether a policy or custom is facially unconstitutional under the Fourteenth Amendment, the Court must ask whether the policy or custom is deliberately indifferent to a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834 (holding that an inmate alleging a

failure to protect claim must demonstrate that an official was deliberately indifferent to a substantial risk of serious harm to the inmate's safety). This is subjected to the same general failure to protect framework discussed above in connection with Hightower's Fourteenth Amendment claim against Major. *See Thomas v. Cumberland County*, 749 F.3d 217, 222–23 (3d Cir. 2014) (using the general "failure to train framework" to determine whether a municipal policy was facially unconstitutional for failure to train employees); *Torcivia v. Suffolk Cnty., N.Y.*, 17 F4th 342, 354–65 (2d Cir. 2021) (examining whether a municipal policy is facially unconstitutional under the Fourth Amendment using the general Fourth Amendment framework).

Although Hightower argued at oral argument that CFCF's policy or custom is facially unconstitutional because it fails "without justification" to extend to "classified persons in intake," (Oral Arg. Tr. at 48:1–3), this does not address the constitutional question of whether that failure renders the policy or custom deliberately indifferent to a substantial risk of serious harm, *Farmer*, 511 U.S. at 834. Rather, as Defendants argue, it is entirely speculative to assume that housing a person classified as "close" custody with a person of a lower custody status inherently poses a substantial risk of serious harm to the inmate of lower custody status.[18] (Doc. No. 62 at 8; Doc. No. 59-15 at 31:3–7 (Deputy Chief Beaufort testifying that close custody inmates are "not . . . considered more likely to be violent because . . . I've had guys, double murderers, and they were model incarcerated persons")); *Bistrian*, 696 F.3d at 370–71

[18] While not impacting the Court's analysis, the Court notes that it would also be burdensome to demand that correctional facilities constantly reshuffle inmates in the short time after they have been classified, but before they are transferred to general population. (*See* Doc. No. 56-9 at 1 (Philadelphia Prisons Policies & Procedures 4.A.4 requiring that inmates be classified within 72 hours of arrival); Doc. No. 59-12 at 29:22–32:1 (Deputy Bowers testifying that inmates are moved to general population ideally within three to five hours after receiving both classification and medical clearance).) This could pose a serious safety and health threat to inmates and correctional officers alike, as increased movement creates more opportunity for dangerous disturbances by inmates and the reshuffling of inmates who have been classified but not medically cleared could potentially increase the transmission of communicable diseases.

(concluding that the risk that "an inmate with a history of violence might attack another inmate for an unknown reason" was too speculative to state a claim of deliberate indifference); *Williams v. Del. Cnty. Bd. of Prison Inspectors*, 844 F. App'x 469, 475 (3d Cir. 2021) (holding that the plaintiff's allegations that he was housed on the same block as maximum-security inmates and escorted through spaces occupied by them were "too speculative to make out a failure-to-protect claim"); *Blackstone v. Thompson*, 568 F. App'x at 84 (holding that the plaintiff, who was violently attacked after being housed with an inmate with a status of "high risk inmate," failed to demonstrate deliberate indifference because "[t]he risk that an inmate with some history of violence might attack another inmate for an unknown reason . . . is too speculative to give rise to an Eighth Amendment claim"); *Casiano v. Russell*, No. 21-918, 2021 U.S. Dist. LEXIS 43587, at *4 (E.D. Pa. Mar. 9, 2021) ("Being housed with inmates who committed serious crimes or who have generally exhibited violent tendencies in the past, without more, does not plausibly establish that an inmate was incarcerated under substantial risk of serious harm sufficient to state a failure to protect claim."); *Greenfield v. County of Lackawanna*, No. 4:CV-05-0217, 2006 U.S. Dist. LEXIS 51580, at *11 (M.D. Pa. July 27, 2006) ("While the record does reveal that [the plaintiff's cellmate] came to Lackawanna County Prison with a history of violent convictions, this is true for the majority of inmates housed in prison, and alone does not establish that defendants were deliberately indifferent to an excessive risk to [the plaintiff's] health or safety.").

Here, there was a risk of harm regardless of who was housed with Tyler in intake. (*See* Doc. No. 59-1 at 20 ("Inmate Tyler was determined to act out violently if he didn't get what he wanted, and it was Plaintiff who was in the cell with him. . . . As Defendant Major stated in her deposition, the assault had nothing to do with Mr. Hightower but rather was just him being in the

cell."); Oral Arg. Tr. at 41:1–2 (Hightower's counsel stating, "Whoever was in that cell was going to get attacked. I believe that.").) Just as Tyler imposed serious harm on Hightower, he would have also posed a risk of serious harm to someone of close custody status. (*Id.*) In that scenario, Hightower's desired policy of reshuffling inmates in intake after classification would have failed to mitigate any risk of serious harm to another inmate. The issue here appears to be that CFCF officials failed to use the discretion afforded by CFCF policy to separate inmates with serious behavioral issues in intake. (*See* Doc. No. 56-9 at 2 (CFCF policy stating that *"[g]uidelines for differentiating single cell assignments* as opposed to routine cells . . . will be as follows: . . . . Staff will ensure that all *inmates who require stringent security for behavioral or legal reasons* are housed separately in designated areas in the quarantine unit") (emphasis added); Doc. No. 59-15 at 17:4–20:21; 22:6–24 (Deputy Chief Beaufort describing circumstances when an inmate may be separated from other inmates during the intake period, such as if an inmate is recognized as a "frequent flier").) However, this failure to follow CFCF guidelines regarding single cell assignments in this instance does not render the policy to house differently classified inmates together in intake unconstitutional, nor does it give rise to *Monell* liability. *See Monell*, 436 U.S. at 691 (holding that a municipality cannot be held liable under § 1983 on a *respondeat superior* theory). Thus, the policy is not unconstitutional on its face.

**2. Pattern of Constitutional Violations**

Likewise, the CFCF policy or custom of maintaining inmate cell designations in intake after classification did not cause a pattern of constitutional violations and does not create an obvious risk of harm. As discussed above, "to establish *Monell* liability, a plaintiff must either point to a facially unconstitutional policy or must show a pattern of the policy being applied unconstitutionally." *Remlinger*, 2022 U.S. Dist. LEXIS 201793, at *13. To attach liability to the

government entity under *Monell*, Hightower "must establish 'scienter-like' evidence with respect to some policymaker." *Eichelman v. Lancaster County*, 510 F. Supp. 2d 377, 395 (E.D. Pa. 2007) (citing *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1062–63 (3rd Cir. 1991)). "[A]bsent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom, or a failure to train." *Id.* (citing *Simmons*, 947 F.2d at 1063). "This evidence must point either to actual knowledge or to reckless indifference on the part of the policymaker." *Id.* (citing *Simmons*, 947 F.2d at 1060–61 & n.14).

Actual knowledge or reckless indifference on the part of the policymaker can be shown through (1) a pattern of unconstitutional conduct or through (2) "circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers–Capitol*, 256 F.3d at 133. *See also Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997) ("Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability."); *Brown v. City of Pittsburgh*, 586 F.3d 264, 292–93 (3d Cir. 2009) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)) ("[P]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing . . . municipal policy, which policy can be attributed to a municipal policymaker."); *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (same). "In any case, the plaintiff must show a causal link between the execution of the government policy and the injuries suffered." *Eichelman*, 510 F. Supp. 2d at 396 (citing *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000)). "More specifically, the plaintiff must

show that the defective policy or custom was the 'moving force' behind the violation of the plaintiff's constitutional rights." *Id.* (citing *Monell*, 436 U.S. at 694). "A plaintiff may do this by establishing that alternatives for preventing this type of harm were known and available to policymakers but that the policymakers either deliberately chose not to pursue them or acquiesced in a longstanding policy or custom of inaction in this regard." *Id.* (citing *Simmons*, 947 F.2d at 1064, 1074).

First, there is insufficient evidence to demonstrate that there was a pattern of unconstitutional conduct. As Defendants argue, Hightower fails to provide evidence of a pattern of violence between inmates of different classification statuses in intake that would be sufficient to place Defendants on notice of a constitutional violation. (Doc. No. 55 at 13.) While Hightower's brief states that "the violence that accompanies the co-mingling of violent and non-violent pretrial detainees is well-settled" (Doc. No. 59-1 at 19), he relies solely on speculative evidence from Deputy Warden Bowers' testimony in support of that assertion. (*Id.* (citing Doc. No. 59-12 at 46:5-21) ("Deputy Warden Bowers testified that in her experience as a deputy warden specific to the intake/quarantine unit, 'there have been and there were many times' where individuals who had a history of violence would assault non-violent inmates in the intake/quarantine unit.").) The full transcript of Bowers' deposition makes clear that Bowers was not able to identify a single instance of direct or concrete evidence of another assault by inmates of different classifications in the intake unit. (*Id.* ("Q: So in your experience . . . , were there occasions where individuals who . . . had a history of violence would assault nonviolent inmates in that unit specifically? Ms. Jankowski: Objection. . . . A: I'm sure that there are - - there have been and there were many times. I mean, I don't know of any cases off the top of my head to give you, but I think that's a fair assessment.").) *See Faulcon v. City of Philadelphia*, 18

F. Supp. 2d 537, 540 (E.D. Pa. 1998) (holding that the plaintiff failed to demonstrate that the City of Philadelphia was deliberately indifferent for having a practice, custom and policy of housing pretrial detainees with convicted murderers in part because the plaintiff did not "present evidence, statistical or anecdotal, that demonstrate[d] that convicted and sentenced criminals are especially dangerous to pretrial detainees"). While CFCF separates inmates by classification in general population, in part due to safety reasons, that fact alone does *not* permit the conclusion that there is a "well-settled" pattern of violence accompanying the comingling of inmates who are of different classifications in intake.

Second, the Court finds that there was no obvious and excessive risk associated with the policy of housing inmates of different classifications together during intake. Hightower argues that "the policy [applied to the general population] itself acknowledges that by the very basis of their classification that separating these individuals reduces the likelihood of violence." (Oral Arg. Tr. at 42:23–43:4.) His counsel continued at oral argument, "I think just the knowledge of why they have this classification process imputes that they know why. It's because you need to separate inmates based on their classifications [sic] status, their custody status for their own protection." (*Id.* at 45:6–12.) However, as discussed at length above, the risk of harm to inmates imposed by a housing assignment with an inmate of a higher custody status, especially for such a short period of time in intake, is far from obvious regardless of the policy in place for general population. *See, e.g.*, *Blackstone*, 568 F. App'x at 84 (holding that the plaintiff, who was violently attacked after being housed with an inmate with a status of "high risk inmate," failed to demonstrate deliberate indifference because "[t]he risk that an inmate with some history of violence might attack another inmate for an unknown reason . . . is too speculative to give rise to

an Eighth Amendment claim").[19] Thus, along with failing to provide evidence of a pattern of constitutional violations that would be sufficient to put the City on notice, Hightower fails to demonstrate that the risk of harm resulting from the policy or custom was so obvious that the City must have been aware of the conduct, and by failing to rectify the harm, sanctioned the harmful conduct.

* * *

Because Hightower fails to show that his injuries were caused by an unconstitutional City policy or custom, this Court must grant summary judgment for the City on his *Monell* claim.

**IV. Conclusion**

For the reasons discussed above, Defendants' motion for summary judgment is granted. An appropriate order follows.

[19] The Court observes without deciding that placing an inmate with a long history of serious institutional misconduct in a cell with another inmate could perhaps pose an obvious risk of harm. But Hightower does not challenge such a specific policy, and instead challenges only the policy or custom to house all inmates together in intake, even if some inmates have higher custody statuses than their cellmates. (Doc. No. 59-1 at 16, 19.) As discussed, Hightower fails to demonstrate that such a policy leads to an "obvious" risk of harm.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD HIGHTOWER<br><br>*Plaintiff,*<br><br>v.<br><br>CITY OF PHILADELPHIA, SERGEANT SHANTEL MAJOR, and CORRECTIONAL OFFICER JOHN DOES 1–10<br><br>*Defendants.* | CIVIL ACTION<br><br>Case No. 2:21-cv-04075-KSM |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiff Richard Hightower appeals to the United States Court of Appeals for the Third Circuit from the district court's order entered on December 22, 2023 [ECF No. 72]. The order granted Defendants' motion for summary judgment, dismissed Plaintiff's claims against Defendants, and closed the case.

Respectfully Submitted:

**KLINE & SPECTER, P.C.**

By: /s/ Charles L. Becker
Thomas R. Kline, Esquire
Charles Becker, Esquire
Colin Burke, Esquire
Ruxandra M. Laidacker, Esquire
Michelle A. Paznokas, Esquire
1525 Locust Street
(215) 772-1000
*Attorneys for Plaintiff*

Dated: January 18, 2024